**William LOFTIS, Appellant,**

v.

**Frank A. EYMAN, Warden, Arizona State Prison, Appellee.**

**No. 19746.**

United States Court of Appeals
Ninth Circuit.

Sept. 20, 1965.

William T. Loftis, in pro. per.

Darrell F. Smith, Atty. Gen. of Arizona, Gary K. Nelson, Asst. Atty. Gen. of Arizona, Phoenix, Ariz., for appellee.

Before BARNES and KOELSCH, Circuit Judges, and MATHES, Senior District Judge.

BARNES, Circuit Judge:

This is an appeal in propria persona by appellant, a prisoner by reason of a state court conviction, of the denial in the district court of his petition for a writ of habeas corpus.

The district court had jurisdiction to entertain the application for a writ of habeas corpus under 28 U.S.C.A. § 2241. The requirement of 28 U.S.C.A. § 2254 (that applicant exhaust all available state court remedies before resorting to the district court) was satisfied by earlier unsuccessful applications to the Supreme Court of Arizona and to the Pinal County, Arizona, Superior Court. This court has jurisdiction on appeal from the district court denial of the writ pursuant to 28 U.S.C.A. § 2253.

Appellant in Superior Court of Maricopa County, Arizona, was charged with second degree murder.

It is unnecessary to go into all the evidence introduced in the state prosecution. Suffice it to say defendant was convicted of manslaughter, and sentenced to from nine to ten years imprisonment. The evidence portrays a sordid homicide in a cheap hotel. One Jean Mangum was found strangled in room 3 of the Mayes Hotel, Phoenix, Arizona, her body stuffed in a closet. The appellant had rented the room.

Appellant appealed to the Supreme Court of the State of Arizona. His conviction was affirmed. State v. Loftis, 89 Ariz. 403, 363 P.2d 585 (1961).

### I—Appeal in State Court

It is necessary, however, before passing on this appeal, to ascertain what points were raised on appellant's appeal in the Arizona state court.

His counsel's assignments of error were as follows:

(1) The refusal of the trial court to permit counsel for the defendant to recall the witness Hurley to ask him where he lived, so as to prove Hurley was in jail at the time of the trial.

Appellant's counsel refused to waive his right to ask such a question, although the court intimated he could call him back for any other legitimate purpose (R.T. 205–09). The Arizona Supreme Court held this was not an abuse of the trial court's discretion. (363 P.2d at 586–587.)

(2) That the testimony of the police officers that they attempted "to contact the defendant," and "to locate Mr. Loftis" at his place of business erroneously raised an inference of flight, or that defendant was hiding. The Arizona Supreme Court specifically held the testimony was proper (363 P.2d at 587).

(3) That the defendant should have been allowed to impeach the *denial* of one Riley, a witness called by defendant (but one who had already testified for the prosecution), that he (Riley) had had a conversation with the deceased prior to her death. (R.T. 293–98.) When counsel

for defendant attempted to cross-examine his own witness (R.T. 299) and to impeach him by his (the attorney's) testimony (R.T. 302), the court allowed defendant's counsel to claim surprise and cross-examine the witness Riley as a hostile witness (R.T. 307). No restrictions were placed on this cross-examination (R.T. 307–15). Counsel for appellant then called the witness Morgan, and attempted to prove the conversation denied by Riley, on one ground only, "as part of the res gestae." (The alleged conversation took place in the P.M. Bar; the death subsequently in a nearby hotel.) The court refused to permit the evidence to go in as part of the res gestae, since the alleged conversation was not "part of the main transaction" and "not spontaneously induced by the excitement of the criminal event which is in issue." The court then denied the offer of the same evidence as impeachment, on the ground it was immaterial—the witness Riley had admitted he had done *(i. e.,* gone to the deceased's room number 3 in the hotel) what defendant's counsel was attempting to prove he had suggested that he and she might do. The alleged conversation was not res gestae and was immaterial. The Arizona Supreme Court found specifically no error in this regard when it affirmed appellant's conviction. (363 P.2d at 587.)

(4) That the court erred in admitting into evidence Exhibits 5 and 6, being pants and shoes owned by one Hurley, found by the maid, Ethel, in the deceased's room after the homicide. The appellant had been seen coming down the hallway from Hurley's unlocked room toward the deceased's room with some clothing and a pair of shoes in his arms. That same day the witness Hurley had found a pair of pants and a pair of shoes missing from his room (R.T. 131), and immediately notified the manager of the hotel. Counsel's only objection to Exhibits 5 and 6 was a weak one; that they had "no probative value" (R.T. 197).[1] The Arizona Supreme Court held this ob-

---

1. Counsel for appellant had earlier raised a lack of foundation (R.T. 82), but this objection was not raised at the time the evidence was admitted. (R.T. 197.)

jection not well taken.  (363 P.2d at 587–588.)

(5) That the court made five errors, "which may not, standing alone, be prejudicial, but altogether deprived appellant of a fair trial."  The second of these, appearing in the paragraph heading of appellant's original brief before the Arizona Supreme Court, but nowhere commented upon otherwise in the brief, reads: "IN NOT GRANTING A MISTRIAL FOR PREJUDICIAL REMARKS MADE IN THE PRESENCE OF THE JURY."

The Arizona Supreme Court found all five alleged errors "wholly unsupported by the record before us, and are thus without merit."  (363 P.2d at 588.)

We have considered these various assignments of error, each of which was rejected by the Supreme Court of Arizona, not only from that court's treatment of them but also from a careful reading of the entire transcript of the trial in the state court and from appellant's presentation of them in his opening brief filed with the Arizona Supreme Court.

We note defendant was not only represented by counsel in his trial, and on his appeal, but that he was represented by counsel (different in each court) who were able, vigorous and forceful.

## II—State Habeas Corpus, No. 1

Petitioner below also filed with the Supreme Court of Arizona a petition for writ of habeas corpus, raising but a single issue, being the same second point referred to in point (5), supra.  This point was noted but not argued on the original appeal.  It alleged that the victim's daughter had, outside of the courtroom, in the presence of some of the jurymen, stated "verbally and loudly" to the defendant: "You dirty murderer you."

The Supreme Court of Arizona denied this petition, apparently without opinion.  One readily sees why this was done, as well as why it was not urged nor supported on the original appeal, when the record is studied.[2]

## III—State Habeas Corpus, No. 2

Appellant, prior to filing his petition for a writ of habeas corpus in the district court, also filed a petition for writ of habeas corpus with the Superior Court of Pinal County where he was confined. This urged a new and different ground —that appellant was held incommunicado and questioned for four hours by police officers while he was ill.  This was allegedly "coercive," and he allegedly was not able "to contact his attorney or his wife or friends."  His petition was denied.

**2.** The record discloses (R.T. 178) (a) that the statement alleged by appellant in his petition to the Arizona Supreme Court differs from the statement quoted by appellant's counsel to the trial court (though not materially); (b) that the statement was made "in the presence" of four jurors, but appellant's counsel "did not know whether the four heard her or not," and appellant's counsel made what was described, in his own words, as "the usual motion for a mistrial."  This was after the court had adjourned for the day, and counsel were in chambers.  The court denied the motion, "at this time," and requested counsel to "have some law in the morning."  In the morning nothing was said of record by anyone about any further showing; no offer of proof was made, nor was there any evidence of any desire to question, or have the court question, any juror.  We can only conclude the Supreme Court of Arizona

felt that on the night of the second day of trial, neither defendant nor his counsel could prove, nor even positively assert, that any member of the jury had heard *any* statement allegedly made by the witness, Linda Mangum, daughter of the deceased.  That situation apparently did not change during the trial.  Defendant's counsel had one-half day in court on the 10th of December, 1959, and the weekend to consider what if any representation should be made to the court as to what, if anything, any juror heard. No factual representation of any kind was made.  No second motion for a mistrial was made, either on Friday morning December 10th, 1959, or on Tuesday morning December 14th, 1959, or at any other time during the trial, nor when the prosecution closed its case (R.T. 274–5) nor when the entire case was closed (R.T. 400–1).  It was about as thoroughly waived as any procedural point' could be.

*IV—Proceedings in Federal District Court*

We now come to the instant petition filed in the district court. It alleges three grounds:

(A) The coercive methods of police questioning and the inability of appellant to contact wife, attorney or friends.

(B) The refusal of the court to permit his counsel to recall a witness to prove where he lived. (See Assignment of Error I in the state case, supra.)

(C) The statement allegedly made in the hearing of some jurors. (See Assignment of Error V(2) in the state case, and in the petition for a writ of habeas corpus before the Arizona Supreme Court, supra.)

The district court judge had before him the reporter's transcript of the evidence of the trial proceedings in the Arizona Superior Court (as do we) and the State Supreme Court decision (as do we) affirming the conviction. The district court judge, in a written opinion, discusses each of appellant's points above mentioned. He decided point (B) was controlled by the finding there was no error therein by the Arizona Supreme Court. He carefully traced the facts appearing in the record which we have discussed, supra, and held the court's failure to declare a mistrial did not amount to such a disregard of justice that due process was offended, citing this court's opinion in Chavez v. Dickson, 280 F.2d 727, 735 (9th Cir. 1960).

With respect to point (A), the district court stated:

"As to the grounds specified in the paragraph above lettered '(A)', the details regarding petitioner's arrest and his questioning for a period of approximately five hours thereafter is fully set forth in the examination and cross-examination of police officers Marshall and Strong, reported in the transcript at pages 229 to 273. However, no objection whatever was made by petitioner's retained counsel to such testimony, including the testimony regarding petitioner's state-ments to the officers. No objection being offered to the testimony, there can be no claim of violation of petitioner's constitutional rights."

We have, as stated above, read the entire trial transcript, paying particular attention to that part relating to the defendant's interrogation by the police officers.

From the record, we find:

(1) The homicide took place on May 13, 1959; there was no confession, nor even any statement taken, signed, witnessed, written up, or offered in evidence, against the appellant at any time, nor was he asked to sign anything at any time.

(2) The two police officers took notes on May 18th from which they wrote up their own reports of the conversation; no reporter was present.

(3) On the morning of May 15th, 1959, three days before the interrogation of which appellant now complains, appellant voluntarily appeared at police headquarters *with his attorney*, to be interviewed in reference to the homicide. At that time his attorney stated the defendant would only state "his name, address and serial number." (R.T. 229.) But his attorney also said if the officers wanted to talk to Loftis, "I will be glad to bring him back to the office." (R.T. 240.) The attorney also said to police officer Marshall: "If you ever want to see my defendant again, or if you want to question him, if you let me know I will have him in your office within two hours." (R.T. 242.)

(4) On May 18th, 1959, at 5:30 P.M., appellant was arrested at his home, by warrant. He asked permission to shave and change to clean clothing. This was granted. He did *not* ask to call an attorney. (R.T. 271.)

(5) Appellant arrived with the police at the station around 6:15 P.M. (R.T. 267.) He was interrogated from then until 9:45 P.M. or 10:00 P.M., interrupted for three or four minutes (Officer Marshall (R.T. 235)) or ten to fifteen minutes (Officer Strong (R.T. 268))

when appellant became nauseated. He was told he would be booked, and he (appellant) asked if he could call his lawyer. He was told he could. He did call his wife. (R.T. 261.) It was then 10:20 P.M. This was to ask her to notify his lawyer. (R.T. 271–72.)

Under the circumstances of this case we find no basis for holding that appellant was denied assistance of counsel, so as to render the statements made by him during the period of interrogation inadmissible under the doctrine announced by the Supreme Court of the United States in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); the case heavily relied upon by appellant herein.[3]

To this time we have mentioned that no confession was here involved. It is doubtful if the three statements objected to are in fact incriminating as to a murder, although two placed him at the scene (a fact he had never seriously denied).

(a) When shown a picture of the victim of the homicide at the morgue, the defendant said: "Oh my God, no, no."

(b) When asked what happened, he said: "I know what happened, but I am scared to tell you, because I don't know what will happen to me."

(c) When about to be booked, he said: "I would give my share in Hell if I could just change the events that happened up in the Mayes Hotel that morning."

These statements indicate he was at one time in hotel room 3 where the homicide took place on the morning it occurred (his fingerprints on the liquor glasses established that), and that some sordid meretricious relationship probably existed between appellant and the lady victim, but little more. We need not reach the question of whether or not such statements were actually incriminatory of the crime charged against Loftis, because we hold he was never denied counsel nor questioned without knowledge of his constitutional rights. Any statements he made were willingly and voluntarily made.

Affirmed.

---

3. Here Loftis had not been denied any right to consult with his counsel; he had actually been warned of his right to keep silent by the attorney of his choice. In Escobedo plaintiff was a twenty-two year old youth of Mexican extraction, to whom the police had spoken in Spanish and promised him instant freedom and immunity in return for a statement. (378 U.S. at 483, 84 S.Ct. 1758, quoting from original Illinois Supreme Court opinion). Here we have an adult business man who spoke as much as he was willing to speak.

Escobedo was interrogated by an Assistant State's Attorney, who asked "carefully framed questions apparently designed to assure the admissibility into evidence of the resulting answers." (378 U.S. at 483, 84 S.Ct. at 1761.) The proof Escobedo could not talk to an attorney was that Escobedo's attorney was present at the jail, seeking to talk to his client while the client was being interrogated.

In Escobedo the defendant moved both before and during the trial to suppress the incriminating statement. Here no motion was made to suppress at any time—no objection was ever made to the officer's testimony.