UNITED STATES of America,
Appellee.

v.

George Edward SLAUGHTER, Appellant.

No. 9800.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 5, 1966.

Decided Sept. 15, 1966.

Haynsworth, Chief Judge, dissented.

Rudolph G. Singleton, Jr., and James R. Nance, Fayetteville, N. C. (Court-assigned counsel) [Nance, Barrington, Collier & Singleton, Fayetteville, N. C., on brief] for appellant.

Theodore George Gilinsky, Atty., Department of Justice (Fred M. Vinson, Jr., Acting Asst. Atty. Gen., and Robert S. Erdahl, Oliver Dibble and Abraham Dash, Attys., Department of Justice, and Robert H. Cowen, U. S. Atty., on brief), for appellee.

Ronald P. Sokol, Charlottesville, Va. amicus curiae.

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, and J. SPENCER BELL, Circuit Judges.

PER CURIAM:

The following opinion was written by Harrison L. Winter, District Judge, who was sitting by assignment with the court when the case was first heard. After rehearing the case en banc this opinion was adopted as the opinion of the full court. It was also noted upon examination of the record that no mention was made in the charge of the possibility of a verdict of a lesser included offense. We assume that if the case is retried this omission will be corrected. Judge Winter's opinion follows:

Appellant, a discharged serviceman, was indicted for first degree murder of one Cortney Reed on the United States military reservation of Fort Bragg, North Carolina, alleged to have been perpetrated on or about May 5, 1962. Upon a jury's verdict of guilty without capital punishment, appellant was sentenced to

life imprisonment. He challenges the legality of his conviction on four grounds. Essentially on constitutional grounds, he contends that certain conflicting and contradictory statements made by him in response to interrogation by certain agents of the Federal Bureau of Investigation, after he was arrested ostensibly on a charge of violation of the Dyer Act and after he had appeared before a United States Commissioner and requested the opportunity to employ counsel, but before counsel had been obtained by him, should not have been admitted at his trial. Secondly, he contends that two items of circumstantial evidence to establish the fact that a fight occurred in a parking lot on the army reservation on the night that the deceased was probably killed, and the fact that there was dried blood on a car in the parking lot the following morning, should not, under the law of evidence, have been admitted at the trial. A third contention is that a letter written by appellant to his wife, in which he expressed an intention to purchase an automobile owned by the deceased, was improperly excluded by the district judge and, lastly, appellant contends that there was insufficient evidence from which the jury could have found him guilty of the crime of which he was charged.

Early in 1962 appellant and the deceased were both members of the United States Army, Headquarters Battery, 16th Artillery Battalion, Fort Bragg, North Carolina, a part of the 82nd Airborne Division. The deceased owned a 1957 Ford hardtop automobile, and it was the deceased's custom to park this vehicle on a parking lot about two hundred feet from the barracks in which he and the appellant lived. The vehicle was in need of repairs, and the deceased arranged to have it repaired at a craft shop on the reservation.

Delivery of the repaired car was made to the deceased on Saturday, May 5, 1962. There was evidence tending to show that he occupied his bunk in a locked sleeping room to which he had one of the three keys extant that night,

left the room in which he slept between 9:30 and 10:00 o'clock A.M. the following morning and was seen in the orderly room, elsewhere on the post, at approximately the same time. On Monday, May 7, 1962, the first muster after May 5, 1962, the deceased was listed as A.W.O.L. On May 17, 1962, his badly decomposed body was found in a two foot grave in a sandy parachute drop area called "Sicily Drop Zone," which was about 10.4 miles from the barracks area, and which was a zone familiar both to the deceased and appellant. The body could be identified from "dog tags" found in the pocket of trousers on the body and from four fingerprints of the right hand. No paper money was found on the body, and a search of the area turned up an old pair of trousers and a black handled hunting knife identified as similar to one seen in appellant's possession on May 5, 1962. The knife bore traces of human blood, but the blood type could not be determined. The trousers contained particles of macadam or blacktop in the abraded area. It was ascertained that death had occurred approximately seven to ten days before, as a result of a stab or penetrating wound through the chest and heart by a knife or knife-like instrument. In the body was discovered partially digested food of the type served at the mess hall for the 16th Artillery Battalion at the noonday meal on May 5, 1962. There was expert testimony that this food was consumed two to six hours, and not more than twelve hours, prior to death.

Appellant was discharged from military service on May 4, 1962, and received separation pay of $98.74. He did not leave the base immediately, but remained around the barracks area until the evening of May 5 in order to settle certain minor financial obligations and attempt collection of such obligations as were due him. It was shown that at about noon on May 5, 1962, while appellant was packing his bags, several different soldiers observed that he possessed a black handled hunting knife, which had a beer or can opener on or near the handle. At

about 2:00 P.M. that day appellant and an acquaintance consumed some beer in the non-commissioned officers club where, again, the hunting knife was seen. From there they drove to Fayetteville, North Carolina, where they consumed more beer, and returned to Fort Bragg about 6:30 P.M. Appellant departed from his friend and stated to him and to another soldier about a half hour later that he would be leaving for home that night; that he and a married couple would be driving to New York City.

At about 10:00 P.M. on the night of May 5, appellant borrowed an entrenching tool from another soldier, stating that he was going to Southern Pines to help a lady move, and that he would return it later. The tool was lent him and he left the barracks with it. About midnight he returned the tool, which was subsequently found to have sand on it.

About 4:00 or 4:30 P.M. on Sunday, May 6, appellant met his wife in New York City. There was testimony that he had first arrived there as early as noon. Appellant was in possession of the deceased's 1957 Ford automobile. It was stipulated that New York is six hundred miles from Fort Bragg, and requires fourteen hours of driving time.

We now come to the facts which give rise to appellant's first contention.

On May 24, 1962, appellant was stopped by a New York police officer for a traffic violation while driving the 1957 Ford hardtop automobile. Appellant said that he had borrowed the automobile from the deceased, and he exhibited a bill of sale vesting title in the deceased and an insurance policy. His only driving license was one from Tennessee, which had expired during his tenure in the service, and he received a summons for driving with an expired operator's permit and was released. Two days later appellant attempted to sell the vehicle to a used car dealer in Brooklyn, New York. When asked for the title he drove the dealer to his apartment, several blocks from the used car lot, went into his apartment and came out exhibiting a title, on the back of which was a certificate of sale or transfer, purportedly signed by the deceased. The dealer noticed that the certificate of sale or transfer was not notarized, and the purported signature of the deceased did not compare with the signature on the other papers. The dealer suggested communicating with the deceased, but the appellant said that he did not know the deceased's whereabouts because he had been discharged from the service. The appellant advanced as a reason for the sale the fact that license plates and insurance were too expensive.

Obviously, the used car dealer, or another to whom appellant also tried to sell the car, became suspicious and communicated his suspicions to the Federal Bureau of Investigation, because the following day, at 10:55 P.M., appellant was arrested by two New York City detectives outside of his apartment house in New York City on the basis of a charge that he had transported a stolen automobile in interstate commerce with knowledge that the vehicle was stolen. At the time of his arrest, and while standing outside of the apartment building, appellant was advised that he did not have to furnish any information, that any information he did furnish could be used against him in a court of law, and that he had a right to consult with an attorney prior to furnishing information. Appellant made no request for counsel, nor did he disclaim a desire to make a statement or furnish any information.

Appellant was taken to the 80th Precinct Station and questioned for about an hour by one of the detectives and an F.B.I. agent about the interstate transportation charge, his employment and former employment. Appellant stated that he had agreed to buy the deceased's car for $300.00 in early April, 1962, and that he gave deceased $75.00 at the time of the agreement, $50.00 in mid-April, and the balance on May 4 or 5, near a parking lot at Fort Bragg. Although appellant claimed that the deceased gave him receipts for the money, the appellant could not produce them. Appellant stated that he had not seen the deceased

since he made the last payment, that he left Fort Bragg on Saturday, May 6, and arrived in New York on Sunday afternoon, May 7, and went to the apartment where he met his wife.

At approximately 4:10 or 4:15 A.M. two other F.B.I. agents arrived at the 80th Precinct Station and took custody of appellant. They removed him to the F.B.I. office. En route he was questioned further, after again being advised that he did not have to make a statement, that any statement could be used against him, and that he had a right to consult an attorney. Appellant denied stealing the car and stated that he had purchased it from the deceased by making three cash payments. He admitted having a knife at Fort Bragg prior to his discharge, but said he had left it under the mattress on his bunk at the post. He denied that the knife had a can opener on the handle, and when asked if he was in any way involved with the death of the deceased he denied complicity. Then appellant indicated that he did not desire to furnish any additional information and interrogation ceased. At 6:00 A.M. appellant was removed to the Federal House of Detention in New York City.

Later in the morning of May 28, 1962, appellant was taken before a United States Commissioner in New York City. The Commissioner advised appellant that the latter was not required to make any statement, that any statement he did make could be used against him, and that he had a right to an attorney. Appellant responded by stating that either he had an attorney who was not present, or that he knew of an attorney that he could get, and the hearing was adjourned to a later date. The Commissioner then took up the question of bail. An assistant United States attorney who was present advised the Commissioner, within appellant's hearing, that appellant, although arrested on a charge of violation of the Dyer Act, was being held as a suspect in a murder case, also. The assistant United States attorney asked that appellant be denied bail. This the Commissioner would not do, but fixed bail at $50,000.00 for the alleged theft of an automobile, admittedly worth not more than $300.00. On June 18, 1962, after the oral statements, shortly to be described, appellant's bail was reduced to $25,000.00. The appearance before the Commissioner was continued until June 5, and then until June 13 and June 18, to enable appellant to obtain counsel. Appellant did not obtain counsel until September 18, 1962, when counsel was appointed to represent him when his trial on the Dyer Act charge was about to begin. He was acquitted of that offense and not indicted in the present case until September 9, 1963.

According to appellant's testimony, one of the F.B.I. agents attempted to interview appellant after lunch following appellant's return from his appearance before the United States Commissioner. Appellant declined to make any statement.

On the afternoon of May 29, the day after the initial appearance before the United States Commissioner, and before appellant obtained counsel, two F.B.I. agents again interviewed appellant at the Federal House of Detention for approximately four hours. The interview began at 1:00 P.M., with a statement to appellant of the now familiar recitation of his rights. Appellant was told that the agents wanted to talk to him about a car in regard to which a warrant had been issued alleging the car was stolen, and, further, the fact that the owner of the car had been found dead on the military reservation at Fort Bragg. According to the testimony of the agents, appellant talked freely of these matters. According to appellant, he declined to discuss them until a telephone call was received in the room in which he was being interrogated, an agent advised appellant that his wife had admitted forging the certificate of sale to the deceased's automobile and would be prosecuted unless appellant cooperated, and appellant concluded that he did not wish to get his wife involved.

During this interview appellant signed no written statement, and he continued

to deny guilt of either matter about which he was questioned, but his answers were not mere reaffirmations of his previous denials. Rather, they were amplifications of his previous denials, in part contradictory, and contained information from which the jury may well have concluded that appellant made false exculpatory statements.

In substance, appellant stated that he had purchased the car for $300.00—an initial payment of $50.00 the first part of April, 1962, $75.00 about April 30, and the remaining $175.00 about May 5. Payments were made in cash, and the deceased gave appellant no receipts. Some of the money used to pay the deceased was obtained from the collection of debts owed appellant, as well as the proceeds of the settlement of a personal injury suit, and his discharge pay of approximately $96.00 received about 11:00 A.M., May 4. On the day preceding discharge, but after collecting the $185.00 owed him, appellant said that he went to Fayetteville, North Carolina, bought some whiskey, and spent several hours with a girl. Later he met a man who gave him the hunting knife, and spent the night with a girl in Fayetteville. The next day he returned to the barracks, showed several soldiers the knife which he had received the day before, and placed the knife under his mattress. He then drank some beer on the post and went with a soldier friend to Fayetteville. Later he returned to the post and met the deceased about 8:30 P.M. on the parking lot near the barracks. In the deceased's automobile the deceased gave appellant the insurance papers and registration certificate, together with a bill of sale reflecting that appellant had paid the deceased $300.00. The deceased showed appellant how to fill in the certificate of transfer on the back of the registration certificate in case appellant wished to sell the car. Appellant put the bill of sale in his wallet and then, at the deceased's request, drove the latter to an establishment between Fort Bragg and Fayetteville, where the deceased alighted from the vehicle and was seen for the last time by appellant.

To continue appellant's oral statement: Appellant said he next returned to the barracks, picked up his belongings and left Fort Bragg about 11:30 P.M., May 5. He drove to New York City, arriving about 5:30 P. M. A few days after arrival he lost his wallet which contained the bill of sale. Subsequently, he discovered that insurance rates for an automobile in New York City were high, and so he concluded to sell the automobile and make an attempt to sell it in Brooklyn. Appellant repeated his previous statement that the deceased had shown him how to fill in the certificate of transfer on the back of the automobile registration document, and then contradicted himself by stating that the deceased had executed the transfer on May 5. Still later, he admitted that his wife signed the deceased's name on the papers. He said that he had told his wife that he had gotten the money to purchase the car by doing guard and K.P. duty for others while at Fort Bragg, but that this was just a story which he had told his wife.

■ Appellant makes three contentions why testimony of the oral statement which he made on the afternoon of May 29 should not have been admitted into evidence. He argues that admission of the statement was in violation of Rule 5 of the Rules of Criminal Procedure, because there was no arraignment before the Commissioner "without unnecessary delay." Second, it is argued that the statement was obtained as a result of mental coercion and, third, that the interrogation was with regard to offenses other than those for which the defendant was being held. In our view the Government correctly points out that appellant was promptly taken before a commissioner and a preliminary hearing adjourned to enable appellant to obtain counsel. Thus, there is no issue as to illegal detention in violation of Rule 5 (a). Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

The government, in recognition of the real issue presented by this appeal, argues that Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), is inapplicable. The government draws particular attention to the language appearing at 378 U.S. 490–491, 84 S.Ct. 1765, where it was said:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution * * *."

and argues that not all of these elements are present in the instant case.

Many of the elements cumulatively found by the Supreme Court to render inadmissible the confession in *Escobedo* are readily apparent here. There can be little question but that the investigation into the violent death of Cortney Reed was no longer a general inquiry, but had begun to focus on appellant. This fact is amply demonstrated by the government's request that appellant be *denied* bail *because he was a suspect in a murder case,* and the government's success in having bail fixed at $50,000.00 in a $300.00 car case. Appellant was, of course, in police custody, and the questions asked by the agents of the F.B.I., as they themselves stated, were designed to elicit information about Reed's death, as well as the formal charge of violation of the Dyer Act which had been made against appellant. Appellant had requested an opportunity to consult counsel. The request was made to a judicial officer of the United States, who evidently understood the request because he continued the preliminary hearing when appellant was first brought before him and, indeed, continued it twice afterward to enable the appellant to obtain counsel.

What, then, is the significance of an expressed desire for counsel, followed by the taking, at the instance of the police, of incriminatory statements, preceded by a recitation of appellant's formal rights, after expression of the desire for counsel, but before counsel had been obtained? Our answer is not found in our previous holding in Davis v. State of North Carolina, 339 F.2d 770 (4 Cir. 1964), nor in the holdings in Jackson v. United States, 119 U.S.App.D.C. 100, 337 F.2d 136 (1964), cert. den., 380 U.S. 935, 85 S.Ct. 944, 13 L.Ed.2d 822 (1965); Payne v. United States, 340 F.2d 748 (9 Cir. 1965); and Otney v. United States, 340 F.2d 696 (10 Cir. 1965) (opinion of Murrah, C. J.), because, in the case at bar, there was a formal request for an opportunity to consult counsel, absent in them. Nor are Crooker v. State of California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958), and Cicenia v. LaGay, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958), determinative, because, as pointed out in the *Escobedo* case, 378 U.S. at 491–492, 84 S.Ct. 1758 their authority has been weakened by subsequent decisions and, to the extent inconsistent with *Escobedo,* were overruled by it.

Among recent decisions spelling out the right to counsel, Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), clearly defined under the facts of that case the beginning of the right to counsel and the end of legally permissive questioning by the police in the absence of counsel, as the time that an indictment was returned. Only to the extent necessary to reach that result, the court approved of the concurring opinions in Spano v. People of State of New York, 360 U.S. 315, 324–327, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). These opinions, however, would have approved as a rule of constitutional law the right to counsel from the time of arrest.

The *Escobedo* case extended the right to counsel to the time that an accused was taken into police custody and before he was formally indicted, thus extending the right as far as was suggested in the *Spano* concurring opinions. It is true, of course, that in *Escobedo* there was present the element that the accused had not been informed of his right to remain silent, and that he had been denied his request to consult with his attorney, although there was some indication that the accused understood his lawyer's signalling him as an admonition to remain silent. 378 U.S. at 480, n. 1, 84 S.Ct. 1758. In the instant case, appellant demonstrated by his previous conduct that he knew his rights, but there is nothing to indicate that he understood or appreciated that false or conflicting exculpatory statements could be used to establish his guilt.

■ By extending the *Massiah* doctrine to the pre-indictment period, the Court in *Escobedo* made applicable to the preindictment period the considerations which it had expressed in its opinion in the *Massiah* case. In *Massiah* it quoted from an opinion of the New York Court of Appeals with approval, and added language from one of its earlier decisions as follows (377 U.S. at 205, 84 S.Ct. at 1202):

" 'Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime.' People v. Waterman, 9 N.Y.2d 561, 565 [216 N.Y.S.2d 70, 75] 175 N.E.2d 445, 448.

"This view no more than reflects a constitutional principle established as long ago as Powell v. Alabama, 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158], where the Court noted that ' * * * during perhaps the most critical period of the proceedings * * * that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thor-

ough-going investigation and preparation [are] vitally important, the defendants * * * [are] as much entitled to such aid [of counsel] during that period as at the trial itself.' Id., [287 U.S.] at 57 [53 S.Ct., at 59, 77 L.Ed. 158]. And since the *Spano* decision the same basic constitutional principle has been broadly reaffirmed by this Court."

Thus, the right to counsel during the pre-indictment period, as established by the *Escobedo* case, means something more than a mere reiteration of the right to remain silent. As a general rule, only the fruits of interrogation in the presence of counsel are constitutionally admissible at the subsequent trial. We are thus constrained to answer the question we have posed by stating that appellant was denied the right to counsel.

■ The fiat of the rule that we should announce in this case is subject to some qualification. The right to counsel, like most other constitutional rights, may be waived. But, as pointed out in Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), citing Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), waiver is a intentional relinquishment or abandonment of a known right or privilege. We find no waiver of the right to counsel in this record. Here, appellant manifested his desire to exercise his right to counsel. For reasons of conscience or otherwise, he did not initiate additional conversation with agents of the F.B.I. about the matter with which he was charged, or the homicide they were investigating. His interrogation was initiated solely by the F.B.I. In the time that had elapsed since the request to consult counsel, appellant could have obtained a lawyer if he knew of one to employ and had the means to employ him; but it cannot be said that his failure to have a lawyer within approximately 25 hours of his request was unreasonable delay on his part, or an attempt to postpone indefinitely a decision on his part whether to submit to interrogation. In fact, he was never able to obtain counsel until counsel was

appointed to represent him at the trial of the Dyer Act charge. Even if we disbelieve appellant's assigned reason why he thereafter permitted himself to be interrogated, there is nothing in this record to support an express change of mind on appellant's part of his desire to consult counsel, and a departure from his previously announced desire to exercise his right should not be lightly inferred. A statement that appellant had a right to remain silent, on the facts here, was insufficient to overcome the respect to which his expressed desire to consult counsel was entitled. This statement here followed by a response to interrogation with nothing more, is insufficient to form a basis for waiver. We conclude that appellant did not waive his rights under the Sixth Amendment, and admission of the testimony concerning what he said in response to interrogation after he claimed the right to counsel was reversible error.

The government argues, citing Massiah v. United States, supra, that it had a right, indeed a duty, to interrogate appellant about the death of Cortney Reed. It argues that there were unquestionably good grounds to arrest appellant on the Dyer Act charge, and that this arrest should not immunize him from interrogation about other serious crimes. We do not decide that arresting authorities may not question a person arrested about other serious crimes, or that the government had no right or duty to investigate the death of Cortney Reed. The record in this case is clear that appellant, although formally arrested for violation of the Dyer Act, was retained in custody because of possible implication in the death of Cortney Reed; hence, we do not see the distinction which the government would have us draw by reason of the grounds for arrest stated in the warrant. All that we decide here is that " * * the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution against *him* at his trial." Mas-

siah v. United States, 377 U.S. at 207, 84 S.Ct. at 1203.

We next turn to the items of circumstantial evidence which appellant contends should not have been admitted at his trial. The first is the testimony of a sergeant who was assigned to sleeping quarters in the same building as appellant. The testimony of the sergeant was that, on the evening of May 5, 1962, he was in the barracks about 9:00 P.M. when he and a friend heard running and a yell in the parking lot outside. The two went to the window and saw two people running down the parking lot. The friend turned the interior lights off, so that they could see more plainly, and they saw one person chase another, saw the first catch up with him and strike him repeatedly, and saw one of the two fall to the ground. The other then went back to the parking lot, got into a car, drove through the lot, and turned in beside an object on the ground. The person driving the car got out of it, put the object in the car and drove away. Visibility was not such that the sergeant could say that the object placed in the car was a body, nor could he give any description of the individuals seen, including their color. Also, he was unable to identify the make of the automobile in which the object which was taken from the ground was removed.

The testimony of the sergeant was ruled inadmissible when first offered for lack of relevancy. This was prior to the time that appellant's answers to additional interrogation, which we find inadmissible, were put into evidence. After appellant's answers were admitted, the district judge then ruled the testimony of the sergeant admissible, and it was received.

In the context in which it was received, we think that the testimony of the sergeant was relevant and material. Since the case must be retried because of our conclusion as to appellant's answers to additional interrogation, we do not think it amiss to add that the testimony was admissible, even without appellant's answers to additional interroga-

tion. By other testimony, appellant was shown to have returned to the barracks area about 6:30 or 7:00 P.M. on the night of the events which the sergeant described, and it was further shown that shortly after the incident which the sergeant described appellant borrowed the entrenching tool. Still other testimony was to the effect that appellant stated that he had made a payment of $175.00 to the deceased in or near the parking lot at Fort Bragg on May 4 or May 5, 1962. Thus, although circumstantial and not conclusive of whether appellant murdered the deceased that night and buried his body, we think the evidence was sufficiently relevant to be considered by the jury and given such weight as the jury thought it deserved. Our comments in this regard are based upon the record before us, excluding any consideration of the testimony we have ruled inadmissible. If on retrial the proof to demonstrate relevancy differs, the district judge will be free to rule on the matter as an original question.

■ The other circumstantial evidence stands in a different light. It was the testimony of another soldier that on May 6, at approximately 9:00 or 9:30 A. M., he left the barracks to go out to a car that a friend had lent him. On the car he noticed what appeared to be blood on the front, the front side, and the grille. The blood-like substance was present without any other sign that the vehicle had been in collision with a solid object. On cross-examination this soldier admitted that he was unable to say whether the occurrence to which he had testified took place on the week-end of May 6 or the week-end of May 13. After this admission on cross-examination, a motion was made to strike the testimony, which was overruled "at the present time," and the motion was not renewed. It is our view that the relevancy of the testimony is tenuous, absent a scientific basis that the substance was blood beyond the mere observation of a layman, but that relevancy is unsupportable where the witness had no more reasonable certainty that his observation occurred on the week-end of May 6 then on the week-end of May 13. The motion to strike his testimony should have been granted.

■ Appellant's third contention is that there was error in excluding a letter written by him to his wife. Appellant's wife, from whom he was divorced at the time of the trial, was called as a witness for the government. On cross-examination, she identified a letter which appellant had written to her. The letter was postmarked Fort Bragg, May 3, 1962, 10:30 A.M., and the testimony was that it was received by appellant's former wife prior to May 5, 1962. Insofar as pertinent to this contention, the letter stated, "as you know I have a car now. It is a '57 Ford hard top." Appellant sought to introduce the letter into evidence immediately after the government's case was closed and appellant's motion for a judgment of acquittal denied.

The district judge properly excluded the letter. Although appellant and appellee argue the significance of the "self-serving" aspect of the letter as affecting its admissibility, we have concluded that the letter constitutes hearsay evidence and does not fall within any of the recognized exceptions to the hearsay rule. McCormick, Evidence § 275 (1954 ed.); 6 Wigmore, Evidence § 1732 (3d ed. 1940). The hearsay exception most nearly applicable to the letter would be the one which permits declarations of intentions and design to prove conduct. As to them, the rule, as stated by McCormick, supra, § 270, p. 572, is "* * * evidence of declarations of a plan, design or intention presently entertained by the declarant is, subject to the usual limitations as to remoteness in time and apparent sincerity common to all declarations of mental state, admissible when offered as evidence that the design was carried out by acts or omissions of the declarant." We cannot say, however, that the district judge was in error when he read "I have a car now" to mean an accomplished act rather than a statement of intention to obtain a car within the foreseeable future, even though the rec-

ord indicates Reed was still in possession of the car when the statement was made.

Finally, appellant contends that his motion for a judgment of acquittal, made at the close of the government's case and renewed at the close of all of the evidence in the case, should have been granted on the grounds that there was legally insufficient evidence on which the jury could find him guilty. We have reviewed carefully the record and conclude that there was no merit in this contention. We deem it unnecessary to recite in further detail the facts which lead us to this conclusion. Because two items of evidence were improperly admitted at the trial, appellant must be retried and, as was true with respect to the testimony of the sergeant concerning the fight, the district judge will be free to rule on the matter of legal sufficiency of evidence to determine guilt on retrial as an original question.

For the reasons stated, the judgment of the district court is reversed, and the case remanded for a new trial.

### ADDENDUM

Our dissenting brother sees a distinction between the Dyer Act charge and the murder charge, viewing the defendant's assertion of a desire to consult counsel as limited to the former. The dissent states that "if [the defendant] had wished to speak to a lawyer on the telephone he would have been allowed to do it." But the undisputed fact is that he did express such a wish to the United States Commissioner, and the case was continued for this purpose. While the formal charge was only a Dyer Act violation, everyone connected with the case appreciated the presence of graver implications. The dissent itself (fn 2) recognizes this. The prosecutor had this in mind when he suggested a $50,000 bail and the Commissioner could have been agreeable to the suggestion only on the premise that he was dealing with the probability of a murder charge.

■ The discussion in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), is entirely beside the point for we do not rely on *Miranda* here. *Escobedo* was decided before this case was tried and no question or retroactivity is involved. When a man is held in default or bail after indicating a desire to arrange for counsel, the FBI should not return to question him about any phase of the subject matter until he has had the opportunity to consult a lawyer. In the circumstances of this case he should have been permitted to get an explanation of his rights from his lawyer and then to elect whether to speak or remain silent. Before Slaughter had this opportunity, the FBI should not have engaged him in conversations designed to condemn him. Admissions obtained by such renewed solicitations, sandwiching questions with warnings, in effect denied the defendant the right of counsel which is his due under our constitutional policy. Reiteration of such FBI "warnings" cannot substitute for the professional legal advice which he had expressly requested. The FBI, it must be remembered, are his accusers, not his counselors.[1]

Reversed and remanded.

---

1. The Second Circuit cases cited in the dissenting opinion presented different circumstances. In Drummond v. United States, 352 F.2d 132 (2d Cir. 1965), for example, the suspect had volunteered incriminating information to the FBI agents from the moment he was arrested in the hope of mitigating his own punishment; and the court explicitly found that he had neither requested nor been denied the assistance of counsel during any of his uncounseled interrogations. Three judges dissented, on the ground that the record supported Drummond's claim that his requests for counsel had been consistently denied. If this claim was true, said the dissenters, the voluntary admissions would still not constitute a waiver of the right to counsel.

And United States ex rel. Stovall v. Denno, 2 Cir., 355 F.2d 731 (1965), dealt with no confession, but with an identification made by a victim in a hospital room. The validity of procedures at a lineup or other identification may involve somewhat different considerations from those with which we are here concerned. Even so, three judges dissented from the holding that the identifications were admissible. Judge Friendly put it succinctly: "I continue to believe that, in the absence of overriding necessity or consent, a man

HAYNSWORTH, Chief Judge (dissenting):

I cannot subscribe to the opinion of my Brothers. I respectfully record my dissent.

This interrogation was as free of coercion and its hallmarks as any interrogation of a prisoner held on a formal charge could be. Done after repeated explanation to him of his rights, and observance of them, I find no basis for overturning the District Court's finding that it was voluntary. I think it both unnecessary and wrong to distort Slaughter's statement to the Commissioner that he wished an opportunity to obtain a lawyer to represent him in defense of the Dyer Act charge into a request for the assistance of a lawyer during interviews occasioned by the continuing investigation of the homicide, a thought Slaughter never expressed.

The Commissioner had explained to Slaughter the elements of the Dyer Act offense, his right to remain silent, the possible use against him of anything he said and his right to counsel. The ensuing discussion between the Commissioner and Slaughter about counsel was clearly referable to representation in the Dyer Act case, specifically in the preliminary hearing. When Slaughter said he had a lawyer or thought he could get one to represent him in that proceeding, the hearing was continued to afford him that opportunity.[1]

When the question of bail was taken up, the Commissioner was told that Slaughter was suspected of the murder of Reed.[2] The homicide was under active investigation which was to continue for many months. Indeed, Slaughter was not charged with the murder until more than fifteen months later when a grand jury indicted him on September 9, 1963.

Clearly, Slaughter knew that the homicide was under investigation. He had been asked about it before, and though he had denied knowledge of it, when the Commissioner was told in his presence that he was suspected of it, he had every reason to believe that he would be asked about it again.

Still, he did not express or intimate in any way a desire to have a lawyer at his side in any subsequent interview. At no other time, either before or after, did he express or intimate any such wish.

On May 29, 1962, the day after Slaughter had been presented to the Commissioner, the agents had developed additional information conflicting with some of the details of the story that Slaughter had told them earlier about his claimed purchase of the automobile. They sought his explanation of this additional information and to question him about the homicide. That is a perfectly legitimate and proper investigative procedure.[3]

Before asking him any questions, however, the agents again explained to him that he need not talk, that anything he said might be used against him, and that he had a right to consult a lawyer be-

who has been brought before a judge on a charge of a capital crime, and has expressed his desire for counsel, is entitled under the Constitution to be let alone until he gets one." 355 F.2d at 745.

1. An engaged lawyer failed to appear on the date to which the hearing was continued. Because of his absence, there was a further postponement. Other continuances were granted, and, ultimately, the court appointed a lawyer to represent him.

2. He was suspected of the murder, of course, because there was probable cause to believe he had stolen the victim's au-

tomobile. The agents may have thought him a likely suspect in the murder case, even the most likely suspect, but, at that time, they had no more than suspicion. Whether, under these circumstances, the investigation had then "focused" upon him within the rule of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, I find it unnecessary to determine, for I find no deprivation of any right to counsel.

3. His lawful detention under the Dyer Act charge was not a barrier to further reasonable interrogation of him in the course of a continuing investigation of the homicide. United States v. Carignan, 342 U.S. 36, 71 S.Ct. 853, 95 L.Ed. 1363.

fore talking to them. He was not told of an undefined right to counsel which he might have related to the formal defense of the Dyer Act charge, the right he had discussed with the Commissioner the day before; he was told specifically that he had a right to a lawyer's advice and assistance in connection with that very interview.

As the majority opinion notes, this was not the first time F.B.I. agents had informed Slaughter of his right to the advice and assistance of a lawyer at the time of, and in connection with, an interview or an interrogation. Contrary to the impression one might glean from the majority opinion, however, these were not nebulous statements of a right to counsel in an uncertain context; at the moment of arrest and at the opening of each subsequent interview, he was specifically told that he need give no information and of the right to consult a lawyer before he gave any. There is no doubt that Slaughter was aware of his right to a lawyer at the interrogation stage, but he never gave the slightest suggestion of a wish to avail himself of it. Clearly, he thought he could handle that alone, and he knew that he could terminate any interview by a bare expression of a wish to talk no more. He had twice done it.

On May 29, 1962, however, he chose to talk. In a sterile atmosphere free of any suggestion of threat or promise, aware of his rights not to talk at all and to consult a lawyer before deciding whether to talk and aware, too, that an attempt to exercise any of those rights would be scrupulously observed, he claimed none of them. He chose to talk. In doing so, I think he waived all of his Fifth and Sixth Amendment rights, for he knew he could then freely exercise them, but preferred not to.

Slaughter was not being held incommunicado. During the course of the interview of May 29th, he expressed a wish to speak to his wife on the telephone. He was permitted to do it. If he had wished to speak to a lawyer on the telephone, he would have been allowed to do it, and he knew it. If he had indicated a wish that the interview be postponed until he could consult a lawyer, that, too, would have been done, and he knew it.

Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, does not govern here, for Slaughter was tried long before it was decided.[4] It is not inappropriate, however, to note its reference of the right to counsel at the interrogation stage to the Fifth Amendment right against self incrimination. It emphasizes the irrelevance of Slaughter's statement to the Commissioner the day before that he wished to engage a lawyer to represent him in the Dyer Act case. The question here, whether he waived his rights not to be questioned at all and not to be questioned until he had consented to it after consulting a lawyer, rights deriving principally, at least, from the Fifth Amendment, is not irrevocably bound up with his right to representation in the formal proceedings in the Dyer Act case, a right derived exclusively from the Sixth Amendment. The difference is highlighted by the specificity of the F.B.I. Agents' explanation of the right to counsel in immediate terms of the requested interview. A waiver of one of those rights to counsel in one context is not inconsistent with an unwavering insistence upon the other. The premise upon which the majority rejects the suggestion of waiver of his right not to talk or to talk only conditionally, that such a waiver would be a departure from his announced intention to exercise his Sixth Amendment right to counsel in the formal defense of the Dyer Act charge, or a retraction of it, appears to me to be baseless.

Here it may be appropriate to interpolate that Slaughter never confessed to anything. He made no statement directly implicating him in the homicide. All that he did was to vary his version of some of the details of his story of a purchase of the vehicle. Such statements,

4. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882.

intended to be exculpatory, are to be excluded when offered by the prosecution, if clearly incriminating statements, obtained under the same circumstances, would be excluded, as *Miranda* teaches, but what occurred underlines Slaughter's evident fearlessness in talking on May 29th and his belief that he did not then need the protection of any of his known rights, except his right to terminate the questioning whenever he wished.

*Miranda* does teach that once a prisoner has requested the assistance of counsel while being interrogated, the interrogation must cease until a lawyer has been obtained or provided, the prisoner has consulted with him and the lawyer is present or there is clear consent to questioning in his absence. Even if *Miranda* generally governed here, however, it would be inapplicable, for Slaughter never made such a request. There was no suggestion that he ever wished it. After *Miranda* of course, his waiver would have been more formally recorded, but, in this pre-*Miranda* case, there is no warrant for this appellate court holding, as a matter of law, that there was no waiver when Slaughter admittedly and incontestably knew that he need not disclose anything, that he had a right to consult a lawyer before disclosing anything and could terminate the interview by an expression of the unconditional or conditional wish, but, knowing all that, and without importunity of any kind, chose unreservedly to talk.

*Miranda* also tells us that once a prisoner has invoked his privilege of remaining silent, interrogation must stop. Slaughter had done that the day before. Interrogation then stopped. Whether with respect to a trial conducted after *Miranda,* that decision means that under no circumstances can there ever be another attempt at interrogation, we need not decide. Here the question is whether the attempt, after a day's lapse of time was coercive under all of the circumstances. I think it was not.

On May 28th, the day before, Slaughter terminated an interview with a statement that he wished to talk no more.

Conversation during the return trip from the Commissioner's office was similarly cut off. On that day, however, Slaughter must have been weary. He had scarcely any sleep the night before. While the record does not disclose his exact words or the specific circumstances in which they were uttered, it is readily inferable that his expression was of a wish to talk no more then and not an invocation of a right not to be questioned again.

The agents who interviewed him on May 29th were not present the day before. They testified they had not known of his termination of interviews the day before. Had they known, however, what they did on the 29th was hardly coercive as a matter of law in light of their careful explanation that he need not talk and the readiness with which Slaughter entered upon and carried on the conversation.

If a police official persists in an interrogation after explaining to a prisoner that he need not talk and the prisoner's expression of an election not to talk, the prisoner may soon get the impression that the statement of his right was an empty formalism and observance of his right a forlorn hope. This record requires no such finding, however. Slaughter's rights had been scrupulously observed. There is no doubt that he knew on May 29th when he responded to the questions of the two new agents that he need not talk to them and that they would respect his right if he chose not to talk.

In *Miranda,* the Supreme Court expressed at length its approval of the F.B.I. practice as disclosed to it, and stated that its practices were *Miranda's* requirements. The F.B.I. has a reputation for fairness, and its internal discipline is such that, generally, its regulations and instructions are carefully obeyed by its agents. Under the circumstances, there is no compelling need to pick at its practices or to overturn convictions because of some slight, imagined flaw.

This is particularly so, in a case such as this, when the evidence of the state-

ments made on May 29, 1962 bore so remotely and tangentially on the issues at the trial. It reflected upon his credibility; it added nothing to the proof of his guilt. It was a long trial involving many witnesses who had to be brought from distant places. To put the government to the great expense and trouble of retrying him and to further dilute the finality of judgments in criminal cases is too high a price to pay for indulgence of a sentimentalism.

Of course, I find no flaw whatever. I find nothing coercive, nothing in violation of the Fifth or Sixth Amendments in questioning Slaughter after repeated, careful explanation to him of his right to counsel in the interrogation stage and at that very time, a right Slaughter never attempted to exercise, merely because he had expressed a wish for the assistance of counsel in the formal proceedings in the Dyer Act case.

The cases in other courts uniformly support my position. An uncounseled prisoner, either before or after arraignment, may waive explicitly or, in a pre-*Miranda* case, implicitly, his right to a lawyer in connection with an interrogation after the expression of a wish for a lawyer.[5]

I would affirm.

---

5. United States v. Drummond, 2 Cir., 354 F.2d 132 (Drummond had thrice been denied permission to telephone a lawyer At the opening of the post-arraignment interview, he told the agent of the last denial. Though the agent did nothing to rectify the earlier denial, Drummond was held to have waived his right to the assistance of counsel in connection with that interview, because he responded readily after explanation of his rights); United States v. Currie, 2 Cir., 354 F.2d 163 (prearraignment interview after the defendant had taken steps to obtain a lawyer, but before he had succeeded); United States ex rel. Stovall v. Denno, 2 Cir., 355 F.2d 731 (Judge Friendly's opinion, dissenting; the majority did not reach the question because they found no right to counsel in connection with that post-arraignment procedure).

Each of those pre-Miranda cases were decided upon the assumption that the principles of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, were applicable, as they are here.

Even if a prisoner has a lawyer and has consulted him, he, alone in the lawyer's absence, may waive his right to his lawyer's assistance in connection with an interrogation. He does so in a pre-Miranda case by responding readily, if he knows his rights. Commonwealth of Pennsylvania ex rel. Craig v. Maroney, 3 Cir., 348 F.2d 22, 31–32, rehearing denied by the court en banc, three judges dissenting because the interrogation was after the indictment, 352 F.2d 30; Babb v. United States, 8 Cir., 351 F.2d 863; Loftis v. Eyman, 9 Cir., 350 F.2d 920; Beavers v. United States, 9 Cir., 351 F.2d 507.