Thomas Patrick **KEEGAN**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 21557.

United States Court of Appeals Ninth Circuit.

Nov. 2, 1967.

Thomas P. Keegan, pro se.

Edward G. Marshall, Las Vegas, Nev. (argued) for appellant.

Joseph L. Ward, U. S. Atty., Robert S. Linnell, Asst. U. S. Atty. (argued), Las Vegas, Nev. for appellee.

Before MADDEN, Judge, Court of Claims, and BROWNING and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge:

Keegan appeals from a judgment whereby he was sentenced following the verdict of a jury convicting him of a violation of 18 U.S.C. § 2312, transporting a stolen vehicle in interstate commerce, knowing that it was stolen.

The evidence, stated most favorably to the government (Keegan offered none), is as follows: On August 14, 1966, Gary Barilla, of Pittsburgh, Pennsylvania, had left his car, a 1966 Pontiac Bonneville, brown with white vinyl top, Pennsylvania license No. 61286R, serial No. 262376 P 236853, in a parking lot adjacent to the apartment house where he lived. He last saw it at 1:00 A.M. on August 14. At 10:00 A.M., the car was gone. No one had his permission to use it. In the glove compartment was a wallet containing a number of cards, including particularly a Credit Card, exhibit 1c, issued by the Pittsburgh National Bank. Keegan was at the apartment of a friend in Pittsburgh, about 10 minutes driving time from the borough where Barilla lived, on August 13 and 14. He left the friend's apartment late in the evening of the 13th, returned at about 4:00 A.M. on the 14th, and then departed.

On September 30, 1966, Keegan arrived at the Riviera Hotel in Las Vegas, Nevada. He registered under the name of Gary J. Barilla, using the address shown on exhibit 1c, and was assigned to Room 326. He had no reservation. The registration card is exhibit 2. By October 2, he had run up a bill for room, meals and other items in excess of $90.00. As a result, Mr. Chappell, the hotel manager, became concerned. He did not know whether Keegan was still at the hotel. He phoned Room 326, got no answer, and then went to the room with a hotel employee, a security guard. He knocked and no one answered, and he entered with a pass key. There he saw an identification card of Thomas Keegan. He wrote the Keegan name and address on the regis-

tration card, exhibit 2. He then returned to his office and called the Clark County Sheriff's office.

Two deputies arrived, one of whom, Leone, was a witness in the case. Chappell showed Leone exhibit 2, including his own writing on the back. Leone then called the "Long Island, New York," police, and they transferred the call to a person who identified herself as Mrs. Keegan, with whom Leone spoke. Chappell and the two officers, who were in plain clothes, found Keegan at the hotel swimming pool. Chappell inquired about Keegan's hotel bill and asked if Keegan would like to establish credit or pay his bill. Keegan said, "Certainly, I have my billfold in the car out at the rear parking lot. Let's go out there and I will take care of it," or "Let's go out to the car. I can show you plenty of identification." The four men proceeded to the parking lot, to Barilla's car. It had a trailer attached to it, carrying a boat. Keegan extracted a key from his bathing suit, opened the car, and produced a wallet.[1] From it he pulled out exhibit 1c and handed it to Chappell, saying "This will take care of my bill."

When Leone saw the name "Gary Barilla" on the card he immediately identified himself as a deputy sheriff and said to Keegan: "You don't have to say anything without the presence of an attorney. Anything that may be said out of the presence of an attorney could be held against you in a court of law. If you don't have funds to pay for an attorney, we will appoint one." Keegan replied: "I don't have nothing to hide. I will answer anything within reason." Leone asked if he knew Keegan, and Keegan replied: "No, I have never heard of him." He also said that the car was his. Asked for its registration, he said he had lost it at the lake, while boating. Asked for a registration for the boat, he gave the same answer.

Keegan asked to go up to his room to change his clothes. Leone said that there was some question as to Keegan's identification and asked whether he would mind if they accompanied him. Keegan said, "No, perfectly alright." The group then went to the room.[2] Chappell gave Leone a key to the adjoining room, and from there Leone telephoned to Barilla, at the address used by Keegan on exhibit 2 when he registered. He talked to Barilla. Meanwhile, Keegan told Chappell that his parents would take care of the bill and that he was A.W.O.L. from the service in New Jersey. Leone returned to Room 326, repeated the warning that he had given at the poolside, and told Keegan that he was under arrest "for a fugitive out of Pennsylvania."[3] Keegan was taken to jail; the car and boat were towed away for safekeeping. The room was not searched.[4] Leone had neither an arrest warrant, a "fugitive" warrant, nor a search warrant.

On the next day, October 3, F.B.I. agent J. Edgar Howerton examined the car, having been told about it by officer Leone, and obtained a description, the li-

---

1. The wallet is exhibit 1 for identification. Its contents are exhibit 1a for identification. The contents were identified by Barilla and Leone on the witness stand. Among the cards was exhibit 1c.

2. Apparently one of the officers handcuffed Keegan at the parking lot, but then, at the latter's request, removed the handcuffs. The officers did not tell Keegan he was under arrest. Officer Leone retained the wallet. So far as appeared Keegan did not object. It is not clear whether it was returned to Keegan before he was taken to jail.

3. Leone also told Keegan, before telling him that he was under arrest, that he had spoken to Barilla in Pennsylvania and that Barilla had told Leone his car was stolen in Pennsylvania. This testimony was stricken by the court in response to an objection that it was hearsay. This may well have been error; it was an accusatory statement to Keegan, and it was a part of the officer's stated reason for arresting him. If error, it was induced by Keegan's counsel.

4. Officer Leone's arrest report was handed to Keegan's counsel and marked Exhibit A for identification. This shows that he was booked "Fugitive Pennsylvania (G TA)" which we take to mean grand theft automobile.

cense number, and the identification number. He also lifted a latent fingerprint from the car, which is exhibit 3. This proved to be Keegan's, an exemplar, taken at the jail, being exhibit 7. Howerton removed from the car trunk a pair of New York license plates which are exhibit 4. On October 4, he went to the Clark County Jail where he interviewed Keegan. He first handed Keegan a document, exhibit 5, for identification.[5] Keegan read it and said he did not wish to sign, but would be willing to talk to Howerton without an attorney being present. Howerton said the interview would center around a 1966 Pontiac Bonneville. Keegan said he got the car from a man in the Bronx, New York City, named George, who said he had a car which had been stolen in Pittsburgh and would sell it for $100. Keegan said that he planned to have the car registered in New York through a friend in the Bronx Department of Motor Vehicles section, but did not wait for the registration and left New York, travelling around the country and finally arriving in Las Vegas on September 30. Howerton handed defense counsel his reports of his investigation which were marked exhibit 6 for identi-

fication.[6] He did not have a warrant to search the car. He filed a complaint with the U. S. Commissioner, a warrant was issued, and the Marshal then took custody of Keegan. This was on October 4 or 5.

■■ We have summarized the record at some length because of the nature of the attack now made on the judgment. Counsel, who did not try the case, now asserts that Keegan's statements to Chappell and to Leone were unlawfully obtained, that the arrest was unlawful, that the statements to Howerton were unlawfully obtained, and that exhibit 1c was unlawfully seized and a motion to suppress it should have been granted. One of the principal barriers to these claims is that trial counsel did not object to any of the evidence in question, with but two exceptions. As to three of the five exhibits received in evidence, including 1c, he said, "No objection." He objected to exhibit 2, after considerable *voir dire* examination, but stated no grounds. We can think of no valid grounds, nor has appellant's counsel suggested that the exhibit should have been excluded. Trial counsel objected to the fingerprint exemplar, exhibit 7, solely on the ground that it

---

5. This document reads, in its entirety:
"Your Rights
        Place: Las Vegas, Nev.
        Date: 10/4/66
        Time: 11:24 a.
We are investigating theft of a 1966 Pontiac & boat & trailer.
Before you are asked any questions, you must understand your rights. You have the right to remain silent; however, anything which you do say can be used against you in court. You have the right to talk to a lawyer for advice before you are asked any questions, and to have him with you during the questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one, and if you are unable to hire a lawyer, one will be appointed for you. If you wish to answer questions or make any statement at this time without a lawyer being present, you have the right to refuse to answer any question and to have this interview terminated at any time.
Do you fully understand what you have just been told?

WAIVER

I have read the statement of my rights as shown above and understand what my rights are. I desire to answer questions and make a statement without first consulting with an attorney and without having a lawyer present at this time. This decision is voluntary of [sic] my part, and no promises, threats or coercion of any nature have been made or used to or against me.
        Signed: _____
Witness: Joel Howerton
Witness: _____
Time: 11:25 a
Keegan would not sign waiver, but did sign did read documents."
(Underlined material handwritten in ink.)

6. These describe his investigation of the car, his interviews with Keegan on October 4, certain evidence received from officer Leone, and his investigation of the boat and the trailer.

was not taken until October 11 or later. Again, appellant's counsel does not claim error. Indeed, no assignment of error is predicated on the overruling of any objection. We could terminate this opinion here. Ordinarily, we do not consider errors not raised in the trial court.

■ Another barrier is that no motion to suppress was made before trial. (Rule 41(e), F.R.Crim.P.) After Leone had testified, trial counsel said that he would like to file a motion with the Clerk. The court said, "Not now." When the government rested, the court said, "You may make your motion." Counsel then moved to suppress all of the exhibits "for unlawful search." The court declined to hear such a motion at that time, a matter which the rule expressly places within his discretion, but said that counsel could make the same argument on motion for judgment of acquittal. This was done, and the motion denied.

■ Appellant's counsel first attacks the lawfulness of the arrest. Standing alone, this is not a ground for reversal. Frisbie v. Collins, 1952, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541; Tyman v. Eyman, 9 Cir., 1967, 371 F.2d 764; Lofland v. United States, 9 Cir., 1966, 357 F.2d 472, cert. denied 1967, 385 U.S. 1026, 87 S.Ct. 755, 17 L.Ed.2d 675. It can become material here only if the arrest produced evidence used at the trial, or used to obtain other evidence used at the trial, and did so in an unconstitutional manner.

Clearly, there was no arrest until after Keegan produced the credit card, exhibit 1c, at the parking lot. Nor was there then a search of the car. What was said at the pool, and the production of the credit card, were voluntary, in connection with a legitimate inquiry conducted by the hotel manager. It is therefore not surprising that trial counsel did not object. We will assume without deciding that Keegan was arrested at the parking lot after Leone identified himself and warned him as to his rights. Trial counsel made no such claim at trial or in his subsequent motion. By the time he made the motion, he had Leone's arrest report

(Ex. A), which showed that the information Leone had might well have justified the arrest as soon as Keegan produced the Barilla credit card as identification. It is no wonder that trial counsel did not raise the question.

■■ Appellate counsel next attacks the sufficiency of Leone's warning, criticizing it because instead of telling Keegan that he did not have to talk at all, he said "You don't have to say anything without the presence of an attorney." No doubt the warning could have been better phrased, but it did tell Keegan, "in clear and unequivocal terms that he ha[d] the right to remain silent" at the time. (Miranda v. State of Arizona, 1966, 384 U.S. 436, 467–468, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694.) And Keegan's response unequivocally shows a waiver. What he thereafter said was admissible. Again, it is no wonder that trial counsel never raised the point.

■ Appellate counsel now asserts that the arrest occurred in the room, after Leone talked on the phone to Barilla, and that it was invalid. But that arrest did not produce either any search, or any statements. Again, it is not surprising that trial counsel did not raise the point. In asserting that Keegan was not told what crime he had committed, appellate counsel blandly disregards Leone's statement to Keegan stricken on trial counsel's motion, set out in footnote 3, supra.

■ Howerton's testimony is attacked by appellate counsel because the government failed to show that a sufficient warning was given under *Miranda*, supra, and because Keegan was not told what offense was being investigated. But trial counsel knew, from exhibit 5, that Keegan was given a full and detailed warning and was told what offense was involved. Appellate counsel blandly disregards exhibit 5. Under the circumstances, trial counsel could see that nothing was to be gained by raising either point. Moreover, if the government had put exhibit 5 in evidence, it would have considerably enhanced the credibility of the statement that Keegan gave to How-

erton. No competent trial counsel could be anything but delighted that exhibit 5 was not offered. But appellate counsel cannot have it both ways and use what was to his client's advantage at trial as ground for error here. Litigation in the federal courts is not that kind of a game.[7]

Next, appellate counsel asserts that exhibit 1c was unlawfully seized. Not so; it was voluntarily tendered by Keegan. No claim is made that any other exhibit was improperly admitted.

Affirmed.

7. While exhibits marked for identification are *not evidence that can be used to support a verdict,* we think it proper to use them when trial counsel's performance of his duty to his client is attacked. They show, beyond cavil, some of the things that he knew when deciding how to try the case.