Jacob JENNINGS, Appellant,

v.

UNITED STATES of America, Appellee.

No. 24358.

United States Court of Appeals Fifth Circuit.

March 8, 1968.

Paul E. Gifford, Miami, Fla., for appellant.

Donald I. Bierman, Asst. U. S. Atty., Miami, Fla., for appellee.

Before COLEMAN and SIMPSON, Circuit Judges, and DAWKINS, District Judge.

COLEMAN, Circuit Judge:

Jacob Jennings, age twenty-five, of Route 1, Box 40, Denmark, South Carolina, previously a convict of attempted murder in the State of Virginia, was convicted of unlawfully transporting a motor vehicle in interstate commerce from Denmark to Fort Pierce, Florida, 18 U.S.C.A. § 2312. We affirm.

James Campbell, a taxi and cafe operator in Denmark, testified that while transporting this appellant and two teenage boys known as "Johnny Mac" and "Ungerald" he was robbed of the vehicle at gunpoint. During the course of the robbery he attempted to flee, was shot in the hip, jumped a fence, and escaped into the woods. He saw the automobile being driven away. When it was returned to him it had a red stripe painted on it.

Robert Nelson, the owner of a service station in Fort Pierce, testified that Jacob Jennings, with two other boys, came to his filling station and asked him to keep a spare tire as security for two dollars worth of gas. Jennings was the spokesman for the group.

James Walker operated a rooming house in Fort Pierce, where Jennings and two teenage boys stayed for awhile. Jennings claimed to own the car, saying that he had bought it in Denmark, South Carolina. While staying at the rooming house he painted a red stripe on it.

James Blakely was a police officer in Fort Pierce. He had served in that capacity for approximately fifteen years. On October 1, 1966, he was "informed by someone [reliability not stated] that this [the automobile with the red stripe] had been stolen" and set out to look for it. He had been informed that the vehicle in question was a 1962 Chevrolet Impala, with a red stripe painted down the center, South Carolina license number E 13–133, 1966.

At a beer and wine joint called "Across the Ditch", Avenue E and 25th Street, officer Blakely saw the automobile. While he was looking at it a man, *who later turned out to be Jacob Jennings,* came out of the joint and asked, "What do you want? What's the matter?" The officer asked him if he was the driver of the car, to which he replied in the affirmative. Blakely then asked the man if he had a driver's license, which was likewise answered in the affirmative. The man then handed Blakely a South Carolina driver's license bearing the name of *James Campbell,* born October 1, 1917, 5 feet 11 inches in height. Since this driver's license called for a forty-nine year old subject and the interrogator was only twenty-five, not 5 feet 11 inches tall, the officer then asked for the registration papers for the vehicle. These papers were likewise in the name of *James Campbell* and described the automobile as a 1962 Chevrolet, bearing South Carolina license number E 13–133. The officer then arrested Jennings but told him he would not question him any further until he got to the police station. Upon arrival at the station, the officer advised Jennings of his rights.[1] After Jennings had answered a few questions too rapidly for the officer to write down the answers, he announced that he would not answer further and the interrogation immediately stopped.

In the meantime, an agent of the Federal Bureau of Investigation had

---

I. "1. You have the right to remain silent.

"2. Anything you say can and will be used against you in a court of law.

"3. You have the right to talk to a lawyer or have him present with you while you are being questioned.

"4. If you cannot afford to hire lawyer, one will be appointed to represent you before any questioning, if you wish one."

Each sentence I read to him; I explained to him what it was and what it meant.

And on the back, I'd say: (Reading:)

"Waiver. After the warning and in order to secure a waiver, the following questions should be asked and an affirmative reply secured to each question:

"Do you understand each of these rights I have explained to you?

"Having these rights in mind, do you wish to talk to us now?"

been notified. Within about an hour he arrived at the police station. He did not know, and neither the Fort Pierce police nor the defendant told him, that defendant had announced an unwillingness to answer any further questions. Proceeding as if there had been no prior interrogation, the F. B. I. agent again gave full and complete warnings. Subsequent to these warnings, the appellant signed a waiver and did not hesitate to discuss the matter with the agent. After they had talked awhile, appellant's statement was reduced to writing and he signed it.

Testifying in his own defense, Jennings contradicted the witness Campbell as to the sequence of events on the night the vehicle was taken. He admitted he was present, disclaimed any participation in the robbery, and asserted that "Johnny Mac" and "Ungerald" (for whom he said he knew no other names) were the real robbers. He admitted that he rode in the vehicle from Denmark to Fort Pierce, driving part of the time, but claimed that this action was prompted by fear of the other two. This had been the substance of his statement to the F. B. I. agent. He said he had not been with the other teenagers prior to the time the three "happened" to get into the cab together. It was his contention that for three weeks he was under fear of harm from them and was afraid to escape or go to the police. Yet, he admitted being alone and having sole possession of the automobile at various times during that period.

On rebuttal, the rooming house operator said that while the three boys were staying at his rooming house Jennings and one of them got into a fight, in which Jennings inflicted a severe whipping. It also came out that these two boys, "Johnny Mac" and "Ungerald" lived in the same community [Denmark] and one of them had been in the Jennings home dating his sister. The two teenagers are not otherwise identified in the record and were not subpoenaed as witnesses by either the Government or the defense.

The sum of the proof, accepted by the jury, constitutes a classic example of open and shut guilt.

It is now urged that before officer Blakely could ask Jennings his name or take his driver's license or ask for the automobile registration papers he was required to warn him of his constitutional rights in the manner required by Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966). Moreover, it is said that after Jennings was taken into custody he was not duly warned of his constitutional rights.

We are of the opinion that under the circumstances of this case Miranda did not require a warning from the officer prior to the arrest. This was not custodial interrogation.[2]

The appellant, a grown man, with at least one prior unfortunate experience with the law, approached the officer and opened the episode by asking what the matter was, what the officer wanted. When the officer asked him for the driver's license and the registration papers, he freely handed them over, after first identifying himself by the name which he knew appeared on those papers. There was nothing forced or coercive about this, unless it

2. "Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way". 384 U.S. 436, at 444, 86 S.Ct. 1602, at 1612.

Thereafter, the opinion frequently uses the term "in-custody" interrogation, which means that a person must be in custody or otherwise deprived of his freedom in a significant way.

can be said that even when a traffic officer stops an automobile on the highway he must first give the *Miranda* warnings before he can ask the name of the driver and request production of a driver's license. Evidently, the officer was not satisfied about the reliability of his information as to the white car bearing the red stripe until an individual voluntarily confronted him and said he was the driver but produced papers which clearly belonged to someone else. This case is perfectly analogous to the factual situation in Evans v. United States, 5 Cir., 1967, 377 F.2d 535, except in that case the F. B. I. agents sought out the subject in her own home. We held that there was no custodial interrogation and that *Miranda* did not apply.[3]

The warnings given by the Fort Pierce police were clearly adequate. Appellant admits in his brief that the F. B. I. warning was adequate but further contends that since appellant had already refused to answer any more questions it was improper, under *Miranda*, for the F. B. I. agent to question him. In support of this contention appellant quotes from *Miranda*, 384 U.S. 436, 444–445, 473, 86 S.Ct. 1602, 1612,

> "If however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned".

> "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked".

Appellant then argues that the present case is similar to Westover v. United States, 384 U.S. 436, 494, 86 S.Ct. 1602, 16 L.Ed.2d 694, a case included in the *Miranda* decision.

■ We do not agree with these contentions. It seems clear to us that what the Court sought to interdict in *Miranda* were those situations in which a person has indicated his desire to exercise his constitutional right of silence but the police refuse to take "no" for an answer. Disregarding his constitutional claim, they continue to ask questions, see 384 U.S. at 453, 86 S.Ct. 1602, 16 L.Ed.2d 694. These techniques were not used in this case. It is admitted that the local police ceased interrogation immediately upon appellant's expression of an unwillingness to proceed further.

In *Westover*, the defendant was arrested by local police. With no preliminary warning of his rights, they kept him in custody for over fourteen hours and interrogated him at length during that period. They obtained no statement. The F. B. I. interrogation began immediately and was conducted in the same police headquarters. The Supreme Court said, "Despite the fact that F. B. I. agents gave warnings at the outset of the interview, from Westover's point of view the warning came

---

3. The factual circumstances surrounding the arrest of Jennings are surprisingly similar to those appearing in Keegan v. United States, 9 Cir., 1957, 385 F.2d 260, in which a conviction for a violation of 18 U.S. C.A. § 2312 was affirmed.

at the end of the interrogation process. In these circumstances an intelligent waiver of constitutional rights cannot be assumed". On the other hand, Jennings was first thoroughly warned by the Fort Pierce police. He found out that immediately upon expressing an unwillingness to proceed the interrogation would promptly stop. He had been in custody only about an hour, and the questioning had been brief. When the F. B. I. agent repeated the warnings, appellant for some reason satisfactory to himself, failed to express the same unwillingness theretofore exercised against the local police. The situation lacks a long way of coming within the *Westover* rule. There was no error in the admission of the statement obtained by the F. B. I.

Lastly, it is argued that the trial judge should have charged the jury, as requested, to the effect that the unexplained failure of the Government to call "Johnny Mac" and "Ungerald" would authorize the presumption that if they had been called their testimony would not have supported the indictment. These witnesses were not subpoenaed by either the Government or the defendant. Jennings claims he did not subpoena them because he did not know their names. We reject this contention, because he had lived in the same small community with them in South Carolina and had traveled with them for at least three weeks after the car was taken. Moreover, he testified that one of them had been to his home and had dated his sister on occasion. If "Johnny Mac" and "Ungerald" were not easily available by reason of being in Federal custody, it shocks credulity to assert that anybody in the exercise of ordinary diligence could have had any trouble ascertaining their real names and learning their whereabouts in the small community of Denmark, South Carolina. See McClanahan v. United States, 5 Cir., 1956, 230 F.2d 919, 925.

The Judgment of the District Court is affirmed.

SIMPSON, Circuit Judge (concurring specially).

I concur in the result. Compare our recent decisions in the following cases: Williams v. United States, 5 Cir. 1964, 328 F.2d 669; Boulden v. Holman, 5 Cir. 1967 (November 3, 1961), 385 F.2d 102, Amador-Gonzalez v. United States, 5 Cir. 1968 (January 10, 1968), 391 F.2d 308 and Windsor v. United States, 5 Cir. 1968 (January 31, 1968), 389 F.2d 530 as well as the recent Ninth Circuit case of Keegan v. United States, 385 F.2d 260, referred to in Footnote 3 to the majority opinion.

This is a fluid and fast-developing field of federal constitutional law. In this situation, a cautious case-by-case approach is necessary to proper development of controlling precedent.