Gerald Dale DRYDEN, a/k/a Gerald Dryden,
a/k/a Jerry Dryden, Appellant
(Defendant below),

v.

STATE of Wyoming, Appellee
(Plaintiff below).

No. 4438.

Supreme Court of Wyoming.

May 9, 1975.

Richard D. Gist, Meier & Gist, Lander, for appellant.

David B. Kennedy, Atty. Gen., and Timothy J. Judson, Asst. Atty. Gen., Cheyenne, for appellee.

Before GUTHRIE, C. J., and McCLINTOCK and THOMAS, JJ.

McCLINTOCK, Justice.

Gerald Dale Dryden [1] appeals his conviction of second degree murder in the district court of Fremont County, Wyoming, complaining of the admission in evidence of certain statements made by him after his arrest without proper advice as to his right to an attorney and, furthermore, after he had requested counsel. Under the disposition we make of the case other errors assigned need not be discussed. The following facts may be said to have been established without contradiction and with-

---

1. Hereinafter referred to as defendant.

out resort to any statements or testimony of the defendant:

At approximately 5:45 p. m., January 17, 1974 the defendant, in a drunken condition and carrying a can of beer in his hand, entered unit number 6 of a motel in Jeffrey City, Wyoming and told the occupants thereof, Kenneth Hitshew and Gloria Bills, either that "Audrey is dead," or, "Audrey is laying in the bathroom dead."[2] Investigation was made by these persons and a representative of the motel owner, and the nude and badly beaten body of Audrey Wolfe, who for some two weeks had been occupying unit number 2 of the motel with defendant, was discovered. The room was then locked and the county authorities notified. Defendant was taken into custody by the deputy sheriff at about 8:30 or 9:00 p. m., and his prosecution for second degree murder followed, leading to the conviction now appealed.

As established by evidence as to which there is no dispute, defendant and Audrey were seen in bars and other places in Jeffrey City during the day of January 17, consuming substantial amounts of beer and whiskey. Some time during the day they became separated and defendant was driven to the motel room by a lady who testified that she had one drink with him and then left. At about 3:00 in the afternoon Steven Lamason, a member of the drilling crew to which defendant had been attached until the 15th of January—on which day defendant had been fired by the driller, Hitshew—went to defendant's room, unit 2 of the motel. At that time defendant had apparently been in bed, with no clothing on, and after admitting Lamason he returned to bed. Lamason testified that he was in the room for some 20 minutes, fixing the time of his visit by reference to a television show then in progress on defendant's set. During this time defendant appeared quite drunken, and Lamason cautioned him about a cigarette which he had lit after Lamason came into the room. After drinking at least part of a beer, Lamason left the room shortly before 3:30 p. m. At this time defendant appeared to be either asleep or "passed out."

In the meantime Audrey had been seen at various places, including the Split Rock Bar, and she was described as being fairly intoxicated. The bartender enlisted the aid of one Marvin Eidem to take her to her motel, which he did in a matter of minutes, let her out of the car, saw her enter a unit, the number of which he did not know at the time but later checked on and determined was unit 2, and returned to the bar. This witness did not look at her closely but noticed no injuries. There is no evidence as to where she was from that time until her body was found in the bathroom of motel unit 2 occupied by her and the defendant, shortly after 5:45 p. m.

There is no evidence fixing the time of the death even approximately, but a qualified pathologist, after testifying concerning extensive injuries, expressed the opinion that her death resulted "from intercranial hemorrhage as a result of the beating of the head and neck." He was clearly of the opinion that the beating was the result of an attack rather than of a fall.

2. According to both the witnesses Bills and Hitshew the defendant thereafter made conflicting statements concerning his discovery of the body. Mrs. Bills testified that "First he said that he came home and seen Audrey laying in the bathroom and thought she was passed out and so he went to bed" and that he later told them "that he came home and Audrey wasn't there. He went to bed, and he woke up and went into the bathroom and he found her laying there." Hitshew's testimony was essentially the same.

With reference to a cut between the first and second knuckle of his right hand, as to which both parties testified and which appeared to them to be recent, Mrs. Bills testified defendant had told them that "he got it from beating on the door and when asked who let him in and he said, Audrey let him in." Hitshew's testimony was that "he [defendant] was asked how he got it and the first time he said that he fell against the wall and cut it. Q And what did he say the second time? A He said that he cut it beating on the door. Q And did he say what happened when he beat on the door? A Yeah. He was asked who let him in, and he said, 'Audrey let me in.'"

Clothing of Mrs. Wolfe was found in the living portion of the room in such position as to indicate that she had proceeded from that room into the bathroom taking off clothing as she proceeded, and her position in the bathroom was such as to indicate to the pathologist that she had collapsed after entering the bathroom.

There is no evidence as to defendant's whereabouts between the time that Lamason left the room and the time that defendant entered the Hitshew room, at about 5:45 p. m., other than statements he made to the sheriff of Fremont County and later to the Fremont County attorney in the presence of this same sheriff and testified to by the sheriff. Defendant's person at the time he came into the Hitshew room and thereafter was described as very clean, particularly his hands, even though he had for some time been working as roughneck on a drilling crew. There is no evidence indicating that he had taken a bath prior to coming to the Hitshew room and the condition of the bathtub and lavatory, when examined by the investigating officers, tends to exclude such possibility. Examination of fingernail and cuticle cuttings from the defendant disclosed nothing of evidentiary value.

The materiality and importance of defendant's statements to the authorities appear to be conceded by the State in its brief, where the following reference is made to an interrogation of defendant by the county attorney, in the presence of the county sheriff, held on January 22, 1974, prior to the first appearance of the defendant before a commissioner:

"At this time, the Appellant acknowledged that he never left unit 2 of the Coates Motel from the time Steven Lamason dropped by, until the dead body of Audrey Wolfe was discovered. * * * This statement placed him in the room from the time Mr. Eidem saw Audrey Wolfe enter it, until the time she was discovered dead. In other words, the Appellant was in the room when the murder took place at the time the murder took place."

Defendant's first point on this appeal relates to custodial interrogation of the defendant by county authorities prior to delayed presentation of his case to a justice of the peace. Defendant contends that he was not properly advised of his rights to consult or have an attorney with him prior to and during the period of interrogation; that he did not waive his rights to an attorney but instead, on numerous occasions, indicated he desired an attorney which the State failed to procure, and that statements improperly procured were permitted in evidence in violation of his rights under §§ 10 and 11 of Art. 1 of the Wyoming Constitution and the fourth, fifth, sixth, and fourteenth amendments to the Constitution of the United States and in violation of the principles announced by the Supreme Court of the United States in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966).

A motion to suppress these statements was filed in the district court and a hearing thereon was held March 21, 1974 before a judge who did not preside at the trial, following which hearing the motion was denied.[3] Accepting that order as the

---

3. In denying the motion the judge observed that

"these exclusionary rules are not rules of constitutional law and they are not rules by statutes. * * *

"In these examinations this afternoon, the Court is not at all satisfied either with the nature or the character of the testimony. The Court still doesn't know what those conversations were and what was said. The Court is not satisfied that it has the best recollection of the witnesses as to what was

said. So the Court necessarily is obliged, then, at this time to make the ruling based on less than what the record states as true and as accurate as it might be upon an examination and cross-examination.

"In all events, the Court is satisfied and it amply appears that there was not an overreaching on the part of the investigating officers. However, inept as they may be, it appears that they were not unfair to the defendant."

final action of the court, there was no re-trial of the suppression issue upon the trial of the case, all parties by their conduct indicating that the objection to admissibility of the statements had been properly saved.[4] The sheriff was permitted to testify both as to the conversation between him and the defendant on January 19 and a conversation between defendant and the county attorney, witnessed by the sheriff on January 22. Shortly after completion of this conversation the defendant was taken before a justice of the peace and formal charges filed. At this time defendant was judicially advised of his right to counsel and an attorney was thereafter appointed for him who continued to represent him throughout the preliminary hearing, the trial, and this appeal.

The following résumé of events following defendant's arrest is essentially as contained in appellant's brief, is not disputed by the State, and our own independent examination of the record convinces us it is substantially correct. These facts were developed at the hearing on motion to suppress. Following his arrest and while being put in the sheriff's vehicle, Deputy Sheriff Earl Osborn "advised defendant of his rights"[5] but took no action to determine if he understood the rights or wanted to exercise the rights. Later, while traveling from Jeffrey City to Lander, Deputy Sheriff Osborn again started to "advise appellant of his rights," at which time appellant stated, "I know my rights, I will get a lawyer when I get into town." Upon his return to the jail the deputy informed his superior of this conversation.

Notwithstanding this information, the first interrogation of appellant occurred at approximately 11:00 p. m., January 17, 1974, in the Fremont County sheriff's office in Lander. At the suppression hearing C. A. McDougall, Fremont County sheriff, testified that he informed appellant that "You don't have to talk," or "You don't have to tell me anything." Anything that you say can and will be used against you in a court of law." "If you wish an attorney, you can have one. If you can't afford one, the court will appoint one for you." Sheriff McDougall then testified, "I asked him if he was willing, if he wanted to tell me what happened out there."

The sheriff did not advise defendant that he could have an attorney present before being questioned or during the questioning. Although defendant was said to have stated he understood his rights, the sheriff did not ask him if he wanted an attorney. Neither did he tell him of his right to stop the statement at any time and that the sheriff would desist if this were suggested. Following this conversation the sheriff proceeded to question the defendant. The record of the hearing on the motion to suppress does not set forth what statement was made by the defendant on the night of the 17th, but as related by the sheriff at the trial defendant summarized the events of the day much as we have recounted them up to the time of Lamason's visit. Setting forth what defendant had told him at that time, the sheriff further testified:

"* * * Sometime in the afternoon there was a knock at the door and one of the roughnecks, referred to as Steve, came in. He let him in, Steve drank a beer with him. Dryden had let him in and had gone back to bed. Steve was

---

4. This would appear to be consistent with the "orthodox" rule as discussed in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed. 2d 908, 1 A.L.R.3d 1205 (1964). The question of whether the Massachusetts or New York procedure should have been followed is not raised by the parties and is not before this Court for determination.

5. Throughout the record we find testimony or statements similar to this. The district judge who heard the motion to suppress frequently admonished the witnesses to state the language of the conversation and not use conclusional phrases. We must explicitly condemn the use of such language in giving testimony, and observe that testimony in that tenor would fail utterly to satisfy the burden of proof resting upon the State as basis for admission of inculpatory statements of the defendant in criminal proceedings.

there for about 15 or 20 minutes and left. *Dryden said that he went back to sleep. He told me that when he woke up he went to the head and discovered the body of Audrey Wolfe in the bathroom.* "Q Did he tell you what he did after he had discovered the body of Audrey in the bathroom? A He told me he had dressed and went down to the driller's room, there at the same motel." (Emphasis supplied.)

The next interrogation occurred between 2:00 and 3:00 p. m. on January 18, 1974, again in Sheriff McDougall's office, and at Sheriff McDougall's request. At this time the sheriff told appellant, "I told Mr. Dryden, I had been out to the scene and I knew more about it than I did the night before. I asked him if he still wanted to talk to me and again advised him of his rights." In an attempt to designate just what rights he advised defendant of, the sheriff testified that he probably said, "You do not have to tell me anything," and, "Do you understand that you do not have to tell me anything," at which time the appellant interrupted, saying that he understood his rights. At this point, Sheriff McDougall commented to appellant about something that he, the sheriff, had learned while in Jeffrey City. The sheriff then testified, "I asked him if he wanted to tell me about that and he said he didn't or some words to that effect. I said, 'If you don't want to tell me the truth, I don't want to talk to you,' and that was the end of the conversation. He did say then, 'I think I should have an attorney,' I said, 'I think you should, too.'" Following this, Sheriff McDougall terminated the conversation and returned defendant to his cell, but took no action concerning obtaining counsel for appellant.[6]

Defendant testified at the hearing on the motion that on the 18th Sheriff McDougall said, "You had time to think about this, would you like to talk about it?" and "I have been to Jeffrey City; I know a lot more about it now," and, "You don't have to tell me a damn thing." Defendant testified that at this time he told the sheriff that he, defendant, had nothing to say to him until he had an attorney, at which time he was returned to his cell.

Although not for an interrogation, appellant did appear before Josef F. Replogle, Justice of the Peace, Lander, Fremont County, Wyoming, on January 19, 1974 concerning a warrant originally issued by the Fremont County sheriff's office in 1963 for a $15.00 insufficient fund check. At this appearance appellant was advised that he was charged with a misdemeanor, was read the statute pertaining to that charge, and was advised that if he requested he could have a jury trial, was entitled to an attorney of his choosing, and that if he could not provide that attorney and if he was willing to sign an affidavit under oath the court would provide one for him.[7] Appellant stated he did not want counsel on the check charge and entered a plea of guilty; he was fined $54.00 and sentenced to ten days in the county jail. Justice Replogle further testified that at this appearance the charge of second degree murder was not mentioned.

On the evening of January 19, 1974 appellant was interrogated by Arnold B. Tschirgi, county and prosecuting attorney, Fremont County, Wyoming.

Mr. Tschirgi never testified concerning any conversation he had with the defend-

---

6. Evidence at the preliminary hearing indicates that the sheriff did not consider this a request for counsel and did nothing about obtaining counsel. However, in answer to the question whether he had informed the court or the county attorney that this man said he had better have an attorney, he replied, "I informed the county attorney what he had told me."

7. The justice states that this probably was the extent of his advice concerning right to counsel. We note that defendant was not here advised of his right to have counsel present prior to and at interrogation by the state authorities. Evidence as to this hearing was therefore of no aid to the State with respect to any warning as to defendant's rights.

ant, but in his opening remarks [8] at the hearing on the motion to suppress stated that he learned of the case on January 19 and he went to the sheriff's office that evening, and further,

"* * * I did introduce myself as the county attorney and told him of his rights. He acknowledged that he knew each of the Miranda rights and I asked him if he was willing to waive those rights and talk to me about the occurrence in Jeffrey City.[9] He said, yes, he was.

"We did talk a long time about just his background and we talked about what happened in Jeffrey City.

"At that time I told him I would talk to him again after I found out about some of the circumstances and details about what had happened at Jeffrey City. I don't think I had any further connection with the case.

"On Monday, the 21st, I went to Jeffrey City with Sheriff McDougall and I talked to witnesses and viewed the area in which Audrey Wolfe was found * * *.

"On the 22nd, I did in the company of Sheriff McDougall at the sheriff's office in the conference room, talk with Mr. Dryden again. I reintroduced myself as the county attorney and told him that I thought I should go through his rights with him. I did, and he acknowledged each one individually. Then I asked him if he was willing to discuss the matter with me further. He waived those rights and he said he was. We did talk further and fairly briefly at that time.

"One of the reasons for my going and talking to him at that time was that I was fairly well-advised of the circum-

stances at Jeffrey City. *I wanted to make sure that the information that I had from him as to his presence in the motel room was true. That was, I guess, maybe the primary reason that I talked to him. He said that he had been present in this motel room at that time, or about the time that we think Audrey Wolfe was killed.*

*"At the end of that conference with him, I told him I thought he ought to have an attorney and I was going to have to make arrangements for him to have counsel.* I did go consult with Commissioner Replogle and told him that I thought he ought to appoint an attorney for this man, or see that he got an attorney." (Emphasis supplied.)

Appellant testified at the suppression hearing that both on the 19th and the 23rd (sic) he told the county attorney that he wanted an attorney. This was never denied.

Testimony of the sheriff establishes that on January 22, 1974 appellant was again interrogated by Tschirgi in the presence of Sheriff McDougall. "The record reflects that appellant was advised of his rights at this time, including the right to have an attorney 'present at the time of questioning if he requested,' * * * and that Appellant stated he would waive his rights."[10]

Following this interrogation the county attorney contacted Justice of the Peace Josef F. Replogle and requested that he see appellant concerning appellant's right to appointed counsel; counsel was appointed that evening, January 22, 1974. Criminal complaint and warrant were filed and issued on January 23, and defendant was first brought before the justice of the peace on January 24, 1974, appearing with his appointed counsel, Richard D. Gist.

---

8. The wisdom of making such a presentation of facts concerning an interrogation of such importance, particularly in view of the highly unsatisfactory testimony and conclusionary testimony of the sheriff (assisted by leading questions), is very dubious.

9. See note 5, *supra*. Again we observe how meaningless it is to say the defendant was

"told of his rights" and that defendant said "he knew each of his Miranda rights," and a meaningful resolution of the question whether there had been an intelligent and informed waiver of constitutional rights after due and proper warning thereof is impossible.

10. This is a direct quotation from defendant's brief.

Preliminary hearing was then set for February 7, 1974.

During the hearing held on appellant's motion to suppress statements, appellant, when asked why he talked to Sheriff McDougall on the evening of January 17, 1974 stated, "I thought I had to because he was the law and I guess I was pretty scared." Appellant further testified, when asked if anyone at any time told him that he could have an attorney present while being interrogated, "Not that I remember. I was always under the impression that he told me that I would be appointed an attorney through the court and I was under—I thought that I had to go into court to have an attorney appointed."[11] And the appellant, when asked if he realized that he had the right to talk to an attorney before anyone questioned him, answered, "No."

As shown above, during no period of interrogation other than the one of January 22, 1974 was appellant ever advised that he had the right to the presence of an attorney prior to or during questioning.

■ Section 11, Art. 1 of the Wyoming Constitution is specific that "No person shall be compelled to testify against himself in any criminal case * * *." In Miskimins v. State, 8 Wyo. 392, 58 P. 411, 415 (1899) this Court, citing Brown on Jurisdiction, Sec. 97, quoted with approval the statement that

" '* * * error of a court in construing any constitutional immunity or right in a criminal case against the accused is as fatal to the judgment as assuming jurisdiction originally where the court had none. Error in either case destroys the power to render any valid judgment, and, if rendered, it is, not simply erroneous, but void.' "

It is further pointed out, 58 P. at 420–421, that the "constitutional privilege [against self-incrimination] is that the evidence shall not be extorted"; the privilege is that "he shall not be compelled to testify"; the

privilege is "imbedded in the constitution, and embodies the wisdom of some centuries of experience upon the subject"; and the immunity is complete unless "waived by the witness with knowledge of his rights." This

"* * * is an ancient principle of the law of evidence that a witness shall not be compelled, in any proceeding, to make disclosures or to give testimony which will tend to criminate him, or subject him to fines, penalties, or forfeitures."

citing Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110. Violation of the constitutional right results in a void, not merely erroneous, judgment.

■■ Maki v. State, 18 Wyo. 481, 485–486, 112 P. 334, 335 (1911) clearly holds that the right not to testify against oneself is a constitutional right. Concerning the burden of proof with respect to in-custody statements, it is said:

"* * * It is the general rule that self-criminating statements are not per se admissible over objection, when the evidence discloses that the defendant was in custody for the crime charged at the time of making such statements, unless shown to have been voluntarily made. Under this rule, there is no presumption that such statements are voluntarily made, but, on the contrary, the presumption is the other way, and upon the trial of an accused the burden is upon the state, seeking to prove such statements, to show their voluntary character."

The voluntary character of the statement where the accused is under arrest cannot be shown "without also showing that he had the benefit of counsel or was fully informed of his rights." Voluntary statements are said to be those which " 'proceed from the spontaneous suggestion of the party's own mind, free from the influence of any extraneous disturbing cause,' " quoting from State v. Clifford, 86 Iowa 550, 53 N.W. 299, 41 Am.St.Rep. 518.

11. From a review of the record and the testimony of the sheriff as to what he had been advised prior to January 22, this is not an unreasonable inference.

■ These two decisions, while involving different facts, are here pertinent because they demonstrate that concern for the protection of constitutional rights of an accused is not the peculiar province of the federal courts. The privilege against self-incrimination and the right to advice of counsel are firmly established in this state. Perhaps it is because of these early pronouncements and the proper adherence thereto by our law enforcement officers that there has been such a paucity of decisions from this Court.

■■ Be that as it may, these decisions alone would seem to demonstrate the basic error of the district judge, as set forth in note 3, *supra*, in holding that exclusionary rules pertaining to statements of the accused were not a matter of constitutional law, and then proceeding to find the statements to have been voluntarily made on the basis of evidence which he himself considered unsatisfactory to the point that he did not know what the conversations were. The question is not whether the examining officers have been "unfair" to the accused; it is whether the State has proved that the statements were freely made by an informed and knowledgeable accused after full and proper warning as to his constitutional rights.

■ While recognizing and protecting the privilege against self-incrimination, this Court has not gone into the details of what is necessary to constitute a valid warning and knowledgeable waiver of rights. The decision of the Supreme Court of the United States in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) is pertinent in the construction that we should give to our own constitutional provision and mandatory as to the construction of the federal constitution. It has been so much cited that extensive quotation therefrom appears unnecessary, but we believe that we can effectively refer thereto in specific reference to the opposing arguments of counsel in this case concerning the admissibility of defendant's statements.

■ We first note and summarily reject the State's argument that a factor which might be considered in whether there was a knowing and intelligent waiver of counsel is the fact that defendant had been convicted of felonies on three prior occasions. The further statement that defendant's frequent past encounters with law enforcement officials "would have given him a great deal of insight into his right to have an attorney present" is not founded on any evidence in the record and is a complete assumption. Moreover, as said in *Miranda,* 384 U.S. at 468–469, 86 S.Ct. at 1625:

"The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. * * * [W]hatever the background of the person interrogated, a warning at the time of interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time."

■ Considering then the testimony of the sheriff as to the interrogation on the night of January 17, at which time defendant admitted his presence in the motel room at the time of the death, we must hold that its admission was clearly error because the sheriff's own testimony did not establish that he advised defendant of his right not only to have an attorney but of his right to have an attorney present prior to and during the questioning. Concerning this, it is said in *Miranda,* 384 U.S. at 470, 86 S.Ct. at 1625:

"* * * Even preliminary advice given to the accused by his own attorney can be swiftly overcome by the secret interrogation process. * * * Thus, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires."

We hold that this requirement is equally pertinent to protection of an accused's privilege not to testify against himself as declared in § 11, Art. 1 of the Wyoming Constitution, and the denial of the motion to suppress this statement was in error. Moreover, defendant at that time had indicated his intention to obtain counsel, which information had been relayed to the sheriff conducting this interrogation so that, as discussed more fully under our next point, the *Miranda* rulings required a termination of the interrogation.

■ In support of its position that defendant was properly advised of and explicitly waived all his constitutional rights, the State relies principally upon the interrogation of January 22, 1974, which defendant seems to concede complied with *Miranda*. A question is thus presented whether, having previously failed properly to advise the accused of his privilege not to testify against himself, and knowing of the accused's desire for counsel, investigating officers could continue to examine him and by finally coming up with a proper warning and an apparently freely made statement, clear away the debris of the earlier and improper examinations.

Without engaging in the exercise in semantics indulged in by the county sheriff, we think it is established that at the earliest possible and appropriate time the defendant indicated his desire to have the assistance and advice of counsel. Instead of then proceeding to determine whether defendant was in a financial position to obtain such counsel or would require the appointment of an attorney, the county authorities ignored the statement and proceeded with continued interrogation that resulted in highly damaging admissions by the defendant. Having again been advised of defendant's desire for counsel on the 18th the sheriff chose to interpret the defendant's remarks as not being a request for counsel and did nothing except to inform the county attorney thereof. The county attorney likewise turned a deaf ear to the request and did nothing about it un-til after obtaining the information he wanted when he told defendant he thought he needed an attorney and would do something about it. It was only following this conversation, and even though defendant had been brought before a justice of the peace on another charge on the 19th, that the county attorney on the 23rd caused complaint and warrant for arrest to be filed and on the 24th brought the defendant before a justice of the peace as required by Rule 5(a), W.R.Cr.P.

■ We hold that this failure to respond to repeated statements of the defendant that he desired counsel was a violation of defendant's constitutional rights as set forth in *Miranda*. It is unequivocally stated in that opinion, 384 U.S. at 473–474, 86 S.Ct. at 1627:

"Once warnings have been given, the subsequent procedure is clear. * * * *If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.* At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. *If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.*

"This does not mean, as some have suggested, that each police station must have a 'station house lawyer' present at all times to advise prisoners. It does mean, however, that if police propose to interrogate a person they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him prior to any interrogation. *If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege so long as they do not question him during that time.*" (Emphasis supplied.)

The opinion then observes that if interrogation continues without an attorney a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and that that court has always set high standards of proof for waiver of constitutional rights.

"Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders." (384 U.S. at 475, 86 S.Ct. at 1628.)

The court then considered specific instances of the application of the principles which it had laid down and in the included opinion in Westover v. United States, 384 U.S. at 494, 86 S.Ct. 1602, considered a situation where the defendant in a California prosecution had been examined by local police in Kansas City, Missouri without proper warning, and then turned over to federal authorities, who after giving him proper warning quickly obtained statements implicating him in a crime in California for which he was subsequently prosecuted and convicted. The Supreme Court said, 384 U.S. at 496–497, 86 S.Ct. at 1639:

" * * * Despite the fact that the FBI agents gave warnings at the outset of their interview, from Westover's point of view the warnings came at the end of the interrogation process. In these circumstances an intelligent waiver of constitutional rights cannot be assumed.

"We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings. A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them.

But here the FBI interrogation was conducted immediately following the state interrogation in the same police station —in the same compelling surroundings. Thus, in obtaining a confession from Westover the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation. In these circumstances the giving of the warnings alone was not sufficient to protect the privilege."

How much more is the pressure of the continued interrogation in the same compelling surroundings by the same obdurate officials refusing to pay any attention to defendant's request for counsel. It seems to us that the mandate of *Miranda* in this respect is clear and that defendant having indicated that he wanted an attorney, the county authorities could not thereafter enter into other interrogation unless and until the defendant had himself reopened the subject.

We think that United States v. Slaughter, 366 F.2d 833, 836 (4th Cir. 1966), although decided some two months prior to *Miranda,* represents the same interpretation of the fifth amendment privilege as we have made. In that case the defendant had been fairly extensively interrogated before being taken before a magistrate, had been advised of his rights, and had made various statements. He was then taken before a United States Commissioner, at which time he was advised of his right to counsel and, as set forth in the opinion (366 F.2d at 837), stated "either he had an attorney who was not present, or that he knew of an attorney that he could get, and the hearing was adjourned to a later date." The next day and before he had obtained counsel he was again questioned by the FBI, and an interview followed beginning with what the court described as the "now familiar recitation of his rights." Certain statements were made by him which the court found could have been damaging to him before the jury. It was contended in the appellate court that these statements should not have been ad-

mitted. The court agreed that the defendant before a judicial officer had requested an opportunity to consult counsel, and asked the question, 366 F.2d at 839:

"What then, is the significance of an expressed desire for counsel, followed by the taking, at the instance of the police, of incriminatory statements, preceded by a recitation of appellant's formal rights, after expression of the desire for counsel, but before counsel had been obtained?"

Finding that there was no waiver, the court said, 366 F.2d at 840:

"The fiat of the rule that we should announce in this case is subject to some qualification. The right to counsel, like most other constitutional rights, may be waived. But, as pointed out in Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), citing Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), waiver is an intentional relinquishment or abandonment of a known right or privilege. We find no waiver of the right to counsel in this record. Here, appellant manifested his desire to exercise his right to counsel. For reasons of conscience or otherwise, he did not initiate additional conversation with agents of the F.B.I. about the matter with which he was charged, or the homicide they were investigating. His interrogation was initiated solely by the F.B.I. * * * Even if we disbelieve appellant's assigned reason why he thereafter permitted himself to be interrogated, there is nothing in this record to support an express change of mind on appellant's part of his desire to consult counsel, and a departure from his previously announced desire to exercise his right should not lightly be inferred. A statement that appellant had a right to remain silent, on the facts here, was insufficient to overcome the respect to which his expressed desire to consult counsel was entitled. This statement here followed by a response to interrogation with nothing more, is insufficient to form a basis for waiver. We conclude that appellant did not waive his rights under the Sixth Amendment, and admission of the testimony concerning what he said in response to interrogation after he claimed the right to counsel was reversible error."

A decision reaching a different result as to the admissibility of the particular statement, Jennings v. United States, 391 F.2d 512, 515 (5th Cir. 1968), cert. denied 393 U.S. 868, is nevertheless enlightening in its interpretation of *Miranda*:

"* * * It seems clear to us that what the Court sought to interdict in *Miranda* were those situations in which a person has indicated his desire to exercise his constitutional right of silence but the police refuse to take 'no' for an answer. Disregarding his constitutional claim, they continue to ask questions * * *. These techniques were not used in this case. It is admitted that the local police ceased interrogation immediately upon appellant's expression of an unwillingness to proceed further."

United States v. Clark, 499 F.2d 802, 806–808 (4th Cir. 1974) involves a situation quite similar in many respects although it does appear that more persuasion was used in that case than the one under consideration. Stating the single issue in the case to be whether the record supported the conclusion that the statement was voluntarily given, the court then pointed out that the "standard of voluntariness is not whether the accused was coerced in traditional terms but whether appropriate measures were taken to safeguard his rights and to insure that his statements were the product of free choice." At his first interview Clark had indicated his desire to speak to an attorney. Under *Miranda*, the interrogation must then cease.

"* * * The Government recognizes this principle but insists that Clark, at the subsequent interview waived his right to counsel and voluntarily confessed to the offense charged. We recognize the possibility that, under given

circumstances, an accused may later waive a right which he previously asserted. * * * However, evidence that an accused has previously asserted his right to confer with counsel is a factor which weighs heavily against a finding that a subsequent uncounseled confession is voluntary."

Additional circumstances weighing against the voluntariness of the confession were that the interview at which Clark had allegedly waived his right to counsel was initiated by the agent.

"* * * This initiation of the subsequent interview at which the confession was elicited is a factor which, under these circumstances, is a strong indication of involuntariness. [Citing *Slaughter*.]

"There is nothing in the record to suggest that agent Kenny's decision to conduct a second interrogation of Clark was prompted by any manifestation on the part of Clark that he had changed his mind and desired to be interrogated without the assistance of counsel; '[o]nce the privilege has been asserted, . . . an interrogator must not be permitted to seek its retraction, total or otherwise.' United States v. Crisp, 435 F.2d 354, 357 (7 Cir. 1970). * * * At the very least, the agents should have afforded Clark sufficient time to employ and consult with counsel before *they initiated* any subsequent interview."

* * * * * *

"The undisputed evidence in this record strongly suggests coercion; the facts do not provide adequate support for the conclusion of the district court that Clark voluntarily waived his constitutional rights. A confession can be received into evidence only after the Government has established by a *preponderance* of the evidence that the confession was voluntarily made. Lego v. Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed. 2d 618 (1972); United States v. Watson, 469 F.2d 362 (5 Cir. 1972). We conclude that the district court was clearly

erroneous in its finding that the defendant had voluntarily waived his constitutional rights under the fifth and sixth amendments."

We have previously pointed out that even the district judge hearing the motion *to suppress was not satisfied with the evidence* and our own review thereof convinces us that he did not properly apply the principles stated in *Miranda* and these other cases and that his finding of voluntariness was clearly erroneous.

Although we are seriously concerned that defendant should be detained in prison for some six days, without counsel and without presentment of his case to a court commissioner, we believe that in view of our disposition of the first point it is unnecessary to consider appellant's argument with respect to the application of Rule 5(a), W.R.Cr.P. It is necessary, however, to consider defendant's further contention that the verdict is not supported by substantial evidence *that there was specific intent to kill.*

 While there were no eye witnesses who testified concerning the events leading to Audrey's death, the testimony is clear, convincing, and unimpeached that she died as the result of a severe beating administered by a third party. We think the jury could properly find that anyone who would commit such a brutal act possessed the intent and malice necessary to constitute the crime of murder in the second degree.

We think that Breeding v. State, 220 Md. 193, 151 A.2d 743, 746 (1959) is pertinent and authoritative. In that case the body of the deceased was found in a remote and hidden place, the cause of death being strangulation by means of a strip of cloth torn from the victim's blouse. There were also signs of violence. The time of death was fixed as within a period of 24 hours ending at least six hours prior to the finding of the body. The evidence related chiefly to contacts of the defendant with the decedent on Saturday, some 48 hours before the body was found. With respect to the contentions, both that the evidence

was circumstantial and that it failed to show intent or malice, the court said:

"As the appellant points out, the evidence is almost wholly circumstantial, but that is not a fatal objection. The inference seems almost inescapable that Mrs. Cannon, whether willingly or unwillingly, left her home Saturday afternoon in the company of Breeding, and in his car. Sometime during the morning or evening of the following day she met her death through manual strangulation, after a severe beating and struggle. The body was found at a point some 600 to 1,000 feet from the point where Breeding's car had been parked and left tire marks. We think the triers of fact could properly draw the inference, from all the circumstances of the case, that she met her death at his hands, and that the killing was premeditated and with malice aforethought. The law on the subject is perfectly clear. * * *" (Citing cases.)

This Court has consistently held that convictions may be based on circumstantial evidence and that it is a question for the jury to weigh such evidence. As said in Buckles v. State, Wyo., 500 P.2d 518, 521 (1972):

"It is conceded that it is the burden of the State to prove premeditated malice beyond a reasonable doubt to sustain a conviction of first degree murder. Deliberation and premeditation as the basis for a conviction of murder may be inferred from the facts and circumstances surrounding the killing."

See also Murdock v. State, Wyo., 351 P.2d 674, 678 (1960); State v. Spears, 76 Wyo. 82, 300 P.2d 551, 565 (1956), quoting with approval Eagan v. State, 58 Wyo. 167, 128 P.2d 215, 225 (1942).

We have said that this Court "must view the evidence in the light most favorable to the state," Bentley v. State, 502 P.2d 203, 208 (1972), and this Court will

"determine questions of law as to whether there is substantial evidence, direct or circumstantial, or both, which, with the reasonable inferences that may be drawn therefrom, will sustain the verdict." Harris v. State, Wyo., 487 P.2d 800, 801 (1971).

Consistently with the rule in Nunez v. State, Wyo., 383 P.2d 726, 728 (1963) that the State must prove beyond a reasonable doubt the purposeful, intentional, and malicious killing of Audrey Wolfe, we believe that in the case at bar there was substantial evidence, outside of defendant's own statements, upon which a jury *could* find that defendant committed the attack upon the decedent, and that it was done intentionally and with malice.

We also reject defendant's argument that the evidence conclusively shows the intoxication of the defendant to such an extent as to eliminate any proper inference of intent. Defendant's lengthy recital of the evidence on the part of intoxication only raises a question of fact for the jury to decide; the jury was instructed as to the pertinence of this claim and no objection was taken thereto. By its verdict the jury may be considered to have decided this factual question contrary to defendant's position. As pointed out in *Breeding*, 151 A.2d at 746–747, "the triers of fact could properly find, as they did, that the accused was not drunk at the time of the murder. They were not obliged to accept his story."

In Rice v. State, Wyo., 500 P.2d 675, 677 (1972) this Court, with specific reference to § 6–16, W.S.1957, cited and relied upon by defendant and under which statute the inebriated condition may be proven as bearing upon the question of intention, said:

"If the defendant is to stand on a claim that he, because of drunkenness, could not have intended the consequences of his acts, that fact would first have to be *proven to the jury* as provided for in § 6–16. To claim insanity on account of drunkenness is equivalent to claiming the absence of intent on account of drunkenness. The question is clearly a jury

question; and the jury was fully instructed on this subject."

However, we have previously stated that the jury *could* have found the facts as indicated without benefit of defendant's statements. We cannot say that it did so, and no one has denied the materiality and importance of the defendant's statements as evidence in the trial. We do not know what a jury might do with respect to the determination of defendant's responsibility for the death in the absence of his own statements. It can hardly be denied that the admission of the statements was prejudicial and as in *Maki* we must hold the conviction must be reversed.

Moreover, as stated in Jackson v. Denno, 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908, 1 A.L.R.3d 1205,

"It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession * * *, and even though there is ample evidence aside from the confession to support the conviction. * * *" (Citing cases.)

We hold that defendant's interrogation was illegally conducted in violation of his constitutional rights under the fifth and fourteenth amendments to the Constitution of the United States and under § 11 of Art. 1 of the Constitution of the State of Wyoming, and the denial of defendant's motion to suppress all such statements was error. The cause is therefore reversed and remanded to the district court with directions to sustain such motion and to exclude all in-custody statements of defendant upon a retrial of the case.